# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| NATIVE AMERICAN GUARDIAN'S ASSOCIATION<br><br>        Plaintiff,<br><br>v.<br><br>WASHINGTON COMMANDERS, JOSH HARRIS, MATTHEW LAUX, and THE NATIONAL CONGRESS OF AMERICAN INDIANS<br><br>        Defendants. | **NATIONAL CONGRESS OF AMERICAN INDIANS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**<br><br>Case No. 3:23-CV-186<br><br>Hon. Peter D. Welte |

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................. 1

II.     BACKGROUND .................................................................................... 2

   A.  The National Congress of American Indians ........................................ 2

   B.  NCAI's Long Held Advocacy to Eliminate Harmful Mascots and Imagery ........ 3

   C.  The Harm from The Use of These Mascots and Images .......................... 4

   D.  The Current Complaint ...................................................................... 8

       1.  *Allegations Against NCAI* ............................................................ 8

       2.  *The Native American Guardian's Association* ............................... 9

III.    STANDARDS OF REVIEW ................................................................. 10

IV.     ARGUMENT........................................................................................ 11

   A.  This Court Lacks Personal Jurisdiction Over NCAI ........................... 11

       1.  *North Dakota's Long-Arm Statute* ............................................. 12

       2.  *Minimum Contacts* ................................................................... 13

   B.  Plaintiff's Civil Conspiracy Claim Is Not Plausible ........................... 22

       1.  *Plaintiff Has Not Plausibly Alleged a Concerted Action to Commit
           a Tortious Act* ....................................................................... 23

       2.  *Plaintiff Has Not Alleged NCAI Acted To Defame It* .................. 25

   C.  Plaintiff's § 1985(3) Claim Is Not Plausible ..................................... 26

       1.  *Plaintiff Has Not Plausibly Alleged an Agreement Between NCAI, the
           Commanders, and Harris to Violate Plaintiff's Civil Rights* ......... 27

       2.  *Plaintiff's § 1985(3) Claim Should Be Dismissed Because It Has
           Not Alleged Any Invidiously Discriminatory Animus at All* .......... 29

       3.  *Plaintiff Has Not Plausibly Alleged It Has Been Deprived of Its Civil Rights or
           Injured at All* ........................................................................ 32

V.      CONCLUSION .................................................................................... 33

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Alexander WF, LLC v. Hanlon*,
   No. 4:14-CV-068, 2015 WL 12803715 (D.N.D. Feb. 19, 2015) .......................... 11, 23, 26, 33
*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..................................................................................... 10, 11, 23, 33
*Atkinson v. McLaughlin*,
   343 F. Supp. 2d 868 (D.N.D. 2004) ...................................................................... 20, 21
*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .............................................................................................. 11, 33
*Boone v. Federal Express Corporation*,
   59 F.3d 84 (8th Cir. 1995) ........................................................................................ 30
*Bray v. Alexandria Women's Health Clinic*,
   506 U.S. 263 (1993) .................................................................................................. 30
*Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*,
   582 U.S. 255 (2017) .................................................................................................. 18
*Brookins Hybrid Drive Sys., LLC v. M.A.C.*,
   3:12-CV-101, 2013 WL 12086636 (D.N.D. May 2, 2013) ........................................ 11
*Brothers and Sisters in Christ, LLC v. Zazzle, Inc.*,
   42 F.4th 948 (8th Cir. 2022) .................................................................................... 17
*Burlington Indus., Inc. v. Maples Indus., Inc.*,
   97 F.3d 1100 (8th Cir. 1996) .................................................................................... 14
*Burris Carpet Plus, Inc. v. Burris*,
   785 N.W.2d 164 (N.D. 2010) .................................................................................... 22
*Calder v. Jones*,
   465 U.S. 783 (1984) .................................................................................................. 20
*Camick v. Holladay*,
   758 Fed. Appx. 640 (10th Cir. 2018) ...................................................................... 32
*City of Omaha Emps. Betterment Ass'n v. City of Omaha*,
   883 F.2d 650 (8th Cir. 1989) ...................................................................... 26, 27, 29
*Dakota Indus., Inc., v. Dakota Sportswear, Inc.*,
   946 F.2d 1384 (8th Cir. 1991) ............................................................................ 20, 21
*Dever v. Hentzen Coatings, Inc.*,
   380 F.3d 1070 (8th Cir. 2004) .......................................................................... passim
*Dornheim v. Sholes*,
   430 F.3d 919 (8th Cir. 2005) .................................................................................... 30
*Epps v. Stewart Info. Servs. Corp.*,
   327 F.3d 642 (8th Cir. 2003) ...................................................................... 11, 12, 13
*Faulk v. City of St. Louis, Missouri*,
   30 F.4th 739 (8th Cir. 2022) .................................................................................... 33

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
  141 S. Ct. 1017 (2021) .................................................................................. 17

*Frazier v. Eagle Air Med Corp.*,
  No. 3:21-CV-136, 2022 WL 1303070 (D.N.D. May 2, 2022) ............................ 12

*Gen. Elec. Cap. Corp. v. Grossman*,
  991 F.2d 1376 (8th Cir. 1993) ....................................................................... 20

*Gould v. P.T. Krakatau Steel*,
  957 F.2d 573 (8th Cir. 1992) ......................................................................... 15

*Hanson v. Denckla*,
  357 U.S. 235 (1958) ...................................................................................... 14

*Hanson v. Scott*,
  645 N.W.2d 223 (N.D. 2001) ......................................................................... 13

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
  466 U.S. 408 (1984) ...................................................................................... 14

*Hicklin Eng'g, Inc. v. Aidco, Inc.*,
  959 F.2d 738 (8th Cir. 1992) ......................................................................... 20

*Int'l Shoe Co. v. Washington*,
  326 U.S. 310 (1945) ...................................................................................... 12

*Jacam Chem. Co. 2013, LLC v. Shepard*,
  No. 1:19-CV-093, 2023 WL 22139 (D.N.D. Jan. 3, 2023) ................. 22, 23, 24

*Johnson v. Woodcock*,
  444 F.3d 953 (8th Cir. 2006) ......................................................................... 13

*Kaliannan v. Liang*,
  2 F.4th 727 (8th Cir. 2021) ................................................................ 17, 18, 19

*Keefe v. City of Minneapolis*,
  785 F.3d 1216 (8th Cir. 2015) ....................................................................... 29

*Kelly v. City of Omaha, Neb.*,
  813 F.3d 1070 (8th Cir. 2016) ................................................................. 27, 28

*Kennedy v. Bremerton Sch. Dist.*,
  142 S. Ct. 2407 (2022) ....................................................................... 1, 2, 3

*KLX Energy Servs. LLC v. Telos Indus., Inc.*,
  No. 1:18-CV-00225, 2021 WL 9666530 (D.N.D. July 29, 2021) ..................... 25

*Kraft v. Essentia Health, Innovis Health, LLC*,
  600 F. Supp. 3d 965 (D.N.D. 2021) .......................................... 10, 11, 23, 33

*Kuhn v. Chesapeake Energy Corp.*,
  No. 1:12-CV-086, 2012 WL 4442798 (D.N.D. Sept. 25, 2012) .............. 23, 24

*K-V Pharm. Co. v. J. Uriach & CIA, S.A.*,
  648 F.3d 588 (8th Cir. 2011) ............................................................ 10, 14, 18

*Lakin v. Prudential Securities, Inc.*,
  348 F.3d 704 (8th Cir. 2003) ......................................................................... 15

*Levine v. American Mensa, Ltd.*,
  3:12-CV-101, 2020 WL 13574113 (N.D. Ga. 2020) ...................................... 16

iii

*Macquarie Bank Ltd. v. Knickel,*
 723 F. Supp. 2d 1161 (D.N.D. 2010) ................................................................ 22
*McDonald v. City of Saint Paul,*
 679 F.3d 698 (8th Cir. 2012) .................................................................... 29, 30
*Means v. Wilson,*
 522 F.2d 833 (8th Cir. 1975) ........................................................................ 30
*Mendoza v. U. S. Immigr. and Customs,*
 *Enf't,* 849 F.3d 408 (8th Cir. 2017) ............................................................... 26
*Nelson v. City of McGehee,*
 876 F.2d 56 (8th Cir. 1989) .......................................................................... 27
*Nuevos Destinos, LLC v. Peck,*
 No. 3:19-CV-00045, 2019 WL 6481441 (D.N.D. Dec. 2, 2019) ......................... 10
*Peterson v. N. Dakota Univ. Sys.,*
 678 N.W.2d 163 (N.D. 2004) ........................................................................ 24
*Revell v. Lidov,*
 317 F.3d 467 (5th Cir. 2002) ........................................................................ 21
*Schmitt v. MeritCare Health Sys.,*
 834 N.W.2d 627 (N.D. 2013) ........................................................................ 24
*Shell v. American Family Rights Ass'n,*
 899 F. Supp. 2d 1035 (D. Colo. 2012) ............................................................ 16
*United Bhd. of Carpenters and Joiners of Am. v. Scott,*
 463 U.S. 825 (1983) ............................................................................... 26, 32
*Whaley v. Esebag,*
 946 F.3d 447 (8th Cir. 2020) ........................................................................ 18
*White v. United States,*
 791 F. Supp. 2d 156 (D.D.C. 2011) ........................................................... 29, 32
*Wilkinson v. Bd. of Univ. and Sch. Lands,*
 981 N.W.2d 853 (N.D. 2023) ................................................................... 22, 26
*World-Wide Volkswagen Corp. v. Woodson,*
 444 U.S. 286 (1980) .................................................................................... 13
*Zidon v. Pickrell,*
 344 F. Supp. 2d 624 (D.N.D. 2004) ........................................................ 15, 21, 22
*Zippo Mfg. Co. v. Zippo Dot Com, Inc.,*
 952 F. Supp. 1119 (W.D. Pa. 1997) ............................................................... 15

## **Statutes**

28 U.S.C. § 1332(a)(1) ..................................................................................... 11
42 U.S.C. § 1985(3) ................................................................................. passim

## **Rules**

Fed. R. Civ. P. 4(k)(1)(A) ................................................................................ 13
Fed. R. Civ. P. 12(b)(2)… .......................................................................... 10, 11

Fed. R. Civ. P. 12(b)(6)……. ............................................................................... 10, 11
N.D. R. Civ. P. 17(a) ................................................................................................. 19
N.D. R. Civ. P. 4(b)(2) ......................................................................................... 12, 13

**<u>Other Authorities</u>**

Alysa Landry, Racial Bullying Persists in Northern California (Sept. 13, 2018),
    https://ictnews.org/archive/racial-bullying-persists-in-northern-california .............. 7

American Addiction Centers, Alcohol and Drug Abuse Statistics (Facts About
    Addiction), americanaddictioncenters.org
    https://americanaddictioncenters.org/addiction-statistics............................................ 5

American Psychological Association, APA Resolution Recommending the Retirement of
    American Indian Mascots (2005), http://www.apa.org/pi/oema/resources/indian-
    mascots.aspx ................................................................................................................ 6

American Psychological Association, APA Resolution Recommending the Immediate
    Retirement of American Indian Mascots, Symbols, Images, and Personalities by
    Schools, Colleges, Universities, Athletic Teams, and Organizations (2005),
    https://www.apa.org/about/policy/mascots.pdf............................................................7

Deborah M. Stone et al., Notes from the Field: Recent Changes in Suicide Rates, by Race
    and Ethnicity and Age Group — United States, 2021 at 72(6): 160-62 (Morbidity and
    Mortality Weekly Report 2023), DOI: http://dx.doi.org/10.15585/mmwr.mm7206a4 .
    ………………………………………………………………………….………… 6

J. Gordon Hylton, *Before the Red\*kins Were the Red\*kins: The Use of Native American Team
    Names In the Formative Era of American Sports*, 1857-1933, 86 N.D. L. Rev. 879 (2010) ......
    ………………………………………………………………….……………5, 6, 7

National Congress of American Indians, *About NCAI*, NCAI.ORG
    https://www.ncai.org/about-ncai#governance-and-membership................................ 2

National Congress of American Indians, *Ending the Legacy of Racism in Sports & the Era of
    Harmful "Indian" Sports Masco*ts (2013), https://search.issuelab.org/resource/ending-
    the-legacy-of-racism-in-sports-the-era-of-harmful-indian-sports-mascots.html........ 4, 5

National Congress of American Indians, *NCAI Governance,*
    https://www.ncai.org/about-ncai/ncai-governance ...................................................... 3

National Congress of American Indians, *Proud to Be*,
    https://www.ncai.org/initiatives/proud-to-be ................................................................ 3

U.S. Census Bureau, "*Poverty Status in the Past 12 Months*" *American Community Survey,
    ACS 1-Year Estimates Subject Tables, Table S1701*, 2022,
    https://data.census.gov/table/ACSST1Y2022.S1701?q=race%20and%20poverty&g=0
    10XX00US ........................................................................................................................ 5

U.S. Department of Education White House Initiative on American Indian and Alaska
    Native Education, *School Environment Listening Sessions Final Report*
    https://sites.ed.gov/whiaiane/files/2015/10/school-environment-listening-
    sessions-final-report.pdf ............................................................................................... 7

Victoria Phillips & Erik Stegman, *Missing the Point: The Real Impact of Native Mascots and
    Team Names on American Indian and Alaska Native Youth, Center for American Progress*
    (July 2014),
    https://digitalcommons.wcl.american.edu/cgi/viewcontent.cgi?articl ............... 5, 6, 7

## I.     INTRODUCTION

For decades the National Congress of American Indians ("NCAI") has advocated for the elimination of derogatory and harmful stereotypes of Native people in media and popular culture, including in sports at all levels. As recently as 2020, NCAI passed a resolution calling for the elimination of race-based Native logos, mascots, names, behaviors, and practices. An integral part of NCAI's mission is to improve the quality of life for Native communities and people. It is therefore clear why NCAI has taken the position it has as these mascots and images have caused real, documented harm to the mental health of American Indian and Alaska Native youth.

The Native American Guardian's Association ("NAGA" or "Plaintiff") has a different viewpoint on this issue. But differing viewpoints cannot form the basis of a conspiracy lawsuit. Rather, the United States has a "long constitutional tradition in which learning how to tolerate diverse expressive activities has always been part of learning how to live in a pluralistic society." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2411 (2022) (citations omitted). The cornerstone of Plaintiff's complaint against NCAI is that NCAI issued a press release consistent with its long-held position, as established in numerous resolutions passed by its membership. But this is all we are left with. Plaintiff's complaint provides nothing for the Court to infer that NCAI did any wrongdoing whatsoever. It is riddled with naked assertions and conclusory statements, and as a result fails to state a claim for which relief can be granted.

What's more, Plaintiff does not even appear to be a North Dakota corporation. Rather, it was incorporated as a "nonstock corporation" in the State of Virginia on April

1

6, 2017, as it represented in other federal legal proceedings in 2021. NCAI is also not a resident of North Dakota, and its contacts with the state have been so minimal that hailing it into court in North Dakota would offend traditional notions of fair play and substantial justice.

For these reasons, NCAI respectfully requests that the Court find that it does not have personal jurisdiction over NCAI, and that it dismiss Plaintiff's claims against NCAI for failure to state a claim for which relief can be granted.

## II.    BACKGROUND

### A.  The National Congress of American Indians

Founded in 1944, NCAI is a national non-profit organization organized in Oklahoma and headquartered in Washington, D.C. with a mission of protecting and enhancing the sovereignty, self-determination, and treaty rights of Tribal Nations; securing traditional laws, cultures and ways of life for Native people; promoting a common understanding of the rightful place of Tribal Nations among domestic American governments and the international community of governments; and improving the quality of life for Native communities and peoples. National Congress of American Indians, *About NCAI*, NCAI.ORG https://www.ncai.org/about-ncai#governance-and-membership. NCAI is organized as a representative Congress of American Indians and Alaska Natives that serves to develop consensus on national priority issues that impact tribal sovereignty. *Id.* Tribal Nation governments pass resolutions to become members of NCAI, selecting official delegates to the NCAI Executive Council Winter Session, Mid-Year Conference, and Annual Convention. *Id.* As a member-based representative

2

Congress, NCAI is governed by voting members who determine NCAI's consensus positions expressed in resolutions, which are developed in committees and sub-committees and then voted on at national conventions. National Congress of American Indians, *NCAI Governance*, NCAI.ORG https://www.ncai.org/about-ncai/ncai-governance. NCAI members also elect the organization's Executive Committee—the NCAI President, 1st Vice President, Recording Secretary, and Treasurer. *Id.* These are elected by the entire membership. *Id.*

### B. NCAI's Long Held Advocacy to Eliminate Harmful Mascots and Imagery

NCAI has long been a strong advocate for eliminating derogatory and offensive mascots, slogans, and team names in sports at all levels. Since 1950, NCAI has worked to eliminate stereotypical American Indian images and team names. Blackwell Decl. at ¶ 16; National Congress of American Indians, *Proud to Be,* NCAI.ORG https://www.ncai.org/initiatives/proud-to-be. NCAI has passed a number of resolutions on the issue. These include, among others:

- A 1950 resolution regarding the misleading portrayal of American Indians in the entertainment world. Blackwell Decl. at ¶ 16; Blackwell Decl. Exhibit C.

- A 1968 resolution regarding the inaccurate and distorted way Native people are depicted in educational materials. *Id.*

- A 1993 resolution calling for the abolition of American Indian nicknames, mascots, and images. *Id.*

- A 1993 resolution to cancel the Commanders' previous team name trademark as disparaging and demeaning. *Id.*

- A 1995 resolution calling for the formation of an Inter-Tribal Advisory Board Regarding the Use of Indian Mascots. *Id.*

3

- A 1997 resolution condemning the use of Indian mascots. *Id.*

- A 1998 resolution condemning use of Indian mascots, calling for all public schools, pro sports teams, and private businesses to discontinue use of Native American imagery. *Id.*

- A 2002 resolution supporting legislation to transform the use of images in schools. *Id.*

- A 2005 resolution in support of NCAA's ban on native mascots, nicknames, and imagery. *Id.*

- A 2013 report titled *Ending the Legacy of Racism in Sports & The Era Of Harmful "Indian" Sports Mascots*.[1]

- A 2013 resolution commending efforts to eliminate racist stereotypes in sports. Blackwell Decl. at ¶ 16; Blackwell Decl. Exhibit C.

- A 2014 resolution in support of the elimination of race-based Native logos, mascots, and names by state athletic associations receiving federal funds. *Id.*

- And a 2020 resolution in support of the elimination of race-based Native logos, mascots, names, behaviors and practices. *Id.*

As can be seen, NCAI and its many members have long supported the removal of these types of logos and imagery, including specifically supporting the removal of the Washington Commanders' former team name.

### C.  The Harm from the Use of These Mascots and Images

There are many reasons for NCAI's stance. These mascots, logos, and symbols are harmful and perpetuate negative stereotypes of Native people. Mascots became popular

---

[1] National Congress of American Indians, *Ending the Legacy of Racism in Sports & the Era of Harmful "Indian" Sports Mascots* (2013), https://search.issuelab.org/resource/ending-the-legacy-of-racism-in-sports-the-era-of-harmful-indian-sports-mascots.html ("*Ending the Legacy*").

during a time in our country when racism and cultural oppression were the norm.[2] This imagery was often based on stereotypical and false historical narratives of violence, ferociousness, and savagery, and such renderings still exist today.[3]

Not only are these mascots extremely offensive, but they also cause real, documented harm to the mental health of American Indian and Alaska Native youth. Native youth already face some of the harshest realities in the nation. For example, the poverty rate for Native people was 21.7% in 2022, compared to 12.6% for the overall population.[4] Further, Native youth are more likely to suffer from addiction and substance abuse issues than the general population.[5] These modern challenges, combined with a history of cultural oppression and trauma, result in feelings of hopelessness for many Native youth.[6] Sadly, the suicide rate in 2021 for American Indian or Alaska Native

---

[2] *Ending the Legacy* at 2.

[3] J. Gordon Hylton, *Before the Red\*kins Were the Red\*kins: The Use of Native American Team Names In the Formative Era of American Sports*, 1857-1933, 86 N.D. L. Rev. 879, 891 (2010).

[4] U.S. Census Bureau, "*Poverty Status in the Past 12 Months*" *American Community Survey, ACS 1-Year Estimates Subject Tables, Table S1701*, 2022, https://data.census.gov/table/ACSST1Y2022.S1701?q=race%20and%20poverty&g=010XX00US (accessed on November 27, 2023).

[5] American Addiction Centers, *Alcohol and Drug Abuse Statistics (Facts About Addiction)* AMERICANADDICTIONCENTERS.ORG https://americanaddictioncenters.org/addiction-statistics.

[6] Victoria Phillips & Erik Stegman, *Missing the Point: The Real Impact of Native Mascots and Team Names on American Indian and Alaska Native Youth*, Center for American Progress (July 2014), https://digitalcommons.wcl.american.edu/cgi/viewcontent.cgi?article=1003&context=fasch_rpt ("*Missing the Point*").

individuals aged 10-24 was 36.3 out of every 100,000 persons — more than three times the national average of 11 per 100,000.[7]

The use of Native-based mascots further escalates these already dire statistics for Native youth, as they result in lower self-esteem, lower sense of community worth, and a lower view of personal potential.[8] Native mascots affirm negative stereotypes, directly harming the mental health of Native youth.[9] Studies partly attribute feelings of inferiority to negative characterizations that are materialized in these mascots.[10] Native youth are faced with these undesirable images, showing them the constrained ways in which others view them.[11] These undesirable images of Native cultures further limit the ways in which Native youth may view themselves.[12] As Native youth continue to struggle to find their sense of identity, they are presented with caricature versions of themselves, and this in turn affects how Native youth view their place in society and their potential.[13]

Further, the American Psychological Association ("APA") found that derogatory representations like Native-based mascots create hostile learning environments for Native students.[14] Native students often face ridicule and harassment in the classroom

---

[7] Deborah M. Stone et al., *Notes from the Field: Recent Changes in Suicide Rates, by Race and Ethnicity and Age Group — United States, 2021* at 72(6): 160-62 (Morbidity and Mortality Weekly Report 2023), DOI: http://dx.doi.org/10.15585/mmwr.mm7206a4.

[8] *Missing the Point*, *supra* at 7.

[9] *Id.*

[10] *Id.*

[11] American Psychological Association, *APA Resolution Recommending the Retirement of American Indian Mascots* (2005), http://www.apa.org/pi/oema/resources/indian-mascots.aspx.

[12] *Id.*

[13] *Id.*

[14] *Id.*

and at sporting events.[15] Such hostile environments result in lower academic achievement and success rates across the board.[16]

Studies also show that the continued use of American Indian mascots is harmful to all students, not just Native students.[17] These mascots teach that stereotyping minority groups is an acceptable practice, further legitimizing discrimination against Native peoples.[18] These images perpetuate misrepresentations portraying Native people as a "culture of people frozen in time."[19] Non-Indians with little contact with Native peoples come to rely on these stereotypes to inform their own understanding of Native Americans' place in society, which can lead to discriminatory behavior.[20]

For example, in 2014 it was reported that Native students in California were being taunted with names like "wagon burners," "savages," and "dirty Indians."[21] Two Native students at the same high school were forced to transfer schools after finding notes on their lockers reading "Watch Your Red-skinned Back."[22] It is for these and other reasons NCAI has long held the stance that it has.

---

[15] *Missing the Point, supra* at 4.

[16] *Id.* at 5.

[17] American Psychological Association, APA Resolution Recommending the Immediate Retirement of American Indian Mascots, Symbols, Images, and Personalities by Schools, Colleges, Universities, Athletic Teams, and Organizations (2005), https://www.apa.org/about/policy/mascots.pdf.

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] Alysa Landry, *Racial Bullying Persists in Northern California* (Sept. 13, 2018), https://ictnews.org/archive/racial-bullying-persists-in-northern-california.

[22] *Id.; see also* U.S. Department of Education White House Initiative on American Indian and Alaska Native Education, *School Environment Listening Sessions Final Report* 41 https://sites.ed.gov/whiaiane/files/2015/10/school-environment-listening-sessions-

### D. The Current Complaint

On September 25, 2023, NAGA filed a complaint against the Washington Commanders, Josh Harris, Matthew Laux, and NCAI claiming 1) defamation; 2) civil conspiracy; and 3) violation of 42 U.S.C. § 1985(3). These claims generally relate to the decision by the Washington, D.C. National Football League team to change its name to the Washington Commanders.

#### 1. *Allegations Against NCAI*

NAGA's factual allegations against NCAI primarily appear at paragraphs 71 through 79 of its Complaint. Pl.'s Comp. ("Complaint") at 13-14, ECF No. 1. NAGA's allegations rely on the assertion that Defendant Harris and others "contacted NCAI to issue a press release showing continued support for the Commanders [sic] decision" and that Harris and the Commanders "used NCAI to shape the public's perception and hide the racist remarks coming from within its organization." *Id.* ¶ 71 at 13. Paragraph 72 alleges that NCAI "issued its own press release." The footnote to Paragraph 72 is to a news item, which NAGA describes as a press release, posted on NCAI's website — www.ncai.org. *Id.* ¶ 72 at 13, n.6. NAGA describes NCAI's press release as applauding the Commanders' decision to not revisit the name change and noting that NCAI sent a letter extending congratulations to the Commanders' new ownership group. NAGA alleges that NCAI's press release "shows that NCAI was working in tandem with the Commanders." *Id.* ¶ 78 at 14.

---

final-report.pdf (noting student in Oklahoma dealt with students saying they were going to send them on a "trail of tears.").

Somehow, out of these facts, NAGA alleges that NCAI engaged in a civil conspiracy with Harris and the Commanders "to further defame NAGA on or about August 30, 2023, when Harris contacted NCAI to issue a press release. The press releases [sic] concealed Laux's defamatory statement from the public's perception, by pretending that it never happened. As such, NCAI gave credence to it by hopping on board the defamation train." *Id.* ¶ 100 at 17. NAGA's 42 U.S.C. § 1985(3) claim is less clear, but seems to allege that NCAI was somehow working with Harris and the Commanders to silence NAGA. *Id.* ¶ 107 at 19.

### 2.   *The Native American Guardian's Association*

Plaintiff Native American Guardian's Association alleges that it "is a nonprofit currently registered with the Internal Revenue Service as a 501(c)(3) corporation." *Id.* ¶ 1 at 6. NAGA alleges that its principal place of business is P.O. Box 742, Devil's Lake, North Dakota and that it is incorporated in the State of North Dakota. *Id.* NAGA is not incorporated in North Dakota, however; it was incorporated as a "nonstock corporation" in the State of Virginia on April 6, 2017. Murphy Decl. ¶¶ 4, 5, Murphy Decl. Exhibit 2. NAGA's registered agent, Jennifer B. Baumgartner, maintains an office in Fairfax, Virginia. *Id.* While NAGA's president, Eunice Davidson, appears to have a North Dakota address, all other corporate officers and principals have addresses in other states, including New York, Texas, New Mexico, and Colorado. *Id.*

According to online records from the North Dakota Secretary of State, NAGA filed with the North Dakota Secretary of State as a "trade name" on November 23, 2015, and became inactive on August 2, 2017, about the time it was incorporated in Virginia.

Murphy Decl. ¶¶ 2, 3; Murphy Decl. Exhibit 1. As recent as November 2, 2021, NAGA represented in legal proceedings that it "is a section 501(C)(3) non-profit corporation organized under the laws of the State of Virginia." Murphy Decl. ¶ 6; Murphy Decl. Exhibit 3.

## III.   STANDARDS OF REVIEW

To survive a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), "a plaintiff must make a prima facie showing that personal jurisdiction exists." *Nuevos Destinos, LLC v. Peck*, No. 3:19-CV-00045, 2019 WL 6481441, at \*7 (D.N.D. Dec. 2, 2019), *affirmed*, 999 F.3d 641 (8th Cir. 2021) (citing *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 591 (8th Cir. 2011); *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072 (8th Cir. 2004). A prima facie showing is established "not by the pleadings alone, but by the affidavits and exhibits presented with the motions and opposition thereto." *Peck*, 2019 WL 6481441, at \*7 (citations omitted). When a defendant challenges personal jurisdiction, the plaintiff "carries the burden of proof, and the burden does not shift to the party challenging jurisdiction." *Id.* The evidence is generally viewed in the light most favorable to the plaintiffs. *Id.*

To survive a Rule 12(b)(6) motion, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Kraft v. Essentia Health, Innovis Health, LLC*, 600 F. Supp. 3d 965, 970 (D.N.D. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). To be plausible, a plaintiff must show that success on the merits is more than a "sheer possibility[.]" *Id.* "Plausibility" requires enough factual content that allows the court to draw the "reasonable inference that the

defendant is liable for the misconduct alleged." *Id.* Threadbare recitals supported by conclusory statements do not meet the plausibility requirement. *Id.* (citing *Brookins Hybrid Drive Sys., LLC v. M.A.C., Inc.*, 3:12-CV-101, 2013 WL 12086636, at *2 (D.N.D. May 2, 2013). While a complaint does not need detailed factual allegations, "it must contain more than labels and conclusions." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Legal conclusions and a "formulaic recitation of the elements of a cause of action" are not accepted as true when considering a motion to dismiss pursuant to 12(b)(6). *Id.* (citing *Iqbal*, 556 U.S. at 681). A complaint does not "suffice if it tenders a naked assertion devoid of further factual enhancement." *Alexander WF, LLC v. Hanlon*, No. 4:14-CV-068, 2015 WL 12803715, at *7 (D.N.D. Feb. 19, 2015) (quoting *Iqbal*, 556 U.S. at 678).

## IV.   ARGUMENT

### A.  This Court Lacks Personal Jurisdiction Over NCAI

NAGA claims diversity jurisdiction under 28 U.S.C. § 1332(a)(1). Complaint ¶ 6 at 7. A federal court in a diversity action may assume jurisdiction over a nonresident defendant only to the extent permitted by the long-arm statute of the forum state—here North Dakota—and by the Due Process Clause. *Dever,* 380 F.3d at 1073 (citations omitted).

To defeat a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), a plaintiff must establish a prima facie showing of personal jurisdiction over the defendant. *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 647 (8th Cir. 2003). That prima facie showing is analyzed "not by the pleadings alone, but by the affidavits and exhibits presented with the motions and in opposition thereto." *Dever*, 380 F.3d at 1072 (citations omitted). The party seeking to establish that a court has personal jurisdiction carries the

burden of proof. *Epps*, 327 F.3d at 647. Under this test, NAGA has the burden of proving facts to support the court's exercise of personal jurisdiction over NCAI. *Dever*, 380 F.3d at 1072.

The court may exercise personal jurisdiction over a party if a two-step inquiry is satisfied: *First*, the party must be "amenable to service of process under the appropriate long-arm statute." *Frazier v. Eagle Air Med Corp.*, No. 3:21-CV-136, 2022 WL 1303070, *2 (D.N.D. May 2, 2022) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). *Second*, "the party challenging personal jurisdiction must have engaged in activities which satisfy the minimum contacts requirements of the Due Process Clause." *Id.*

### 1. *North Dakota's Long-Arm Statute*

North Dakota's long-arm statute, Rule 4(b)(2) of the North Dakota Rules of Civil Procedure, provides, in part, that,

> [a] court of this state may exercise personal jurisdiction over a person who acts directly or by an agent as to any claim for relief arising from the person's having such contact with this state that the exercise of personal jurisdiction over the person does not offend against traditional notions of justice or fair play or the due process of law . . . .

N.D. R. Civ. P. 4(b)(2). If jurisdiction is premised on this provision, "only a claim for relief arising from bases enumerated" in Rule 4(b)(2)(A) through (G) may be asserted against that person. Those enumerated circumstances include transacting any business in the state and committing a tort within or outside the state causing injury to a person or property within the state. Rule 4(b)(2)(A), (C).

12

A federal court exercises personal jurisdiction to the same extent as a court of general jurisdiction in the state where the federal district court is located. Fed. R. Civ. P. 4(k)(1)(A). North Dakota's Rule of Civil Procedure 4(b)(2) "authorizes North Dakota courts to exercise personal jurisdiction over nonresident defendants to the fullest extent permitted by due process . . ." *Hanson v. Scott*, 645 N.W.2d 223, 230 (N.D. 2001) (citations omitted). When a state's "long-arm statute is coextensive with constitutional limits, [a district court] need only determine whether the assertion of jurisdiction . . . offends due process." *Johnson v. Woodcock*, 444 F.3d 953, 955 (8th Cir. 2006) (citation omitted).

### 2. *Minimum Contacts*

"Due Process requires 'minimum contacts' between [a] non-resident defendant and the forum state such that 'maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Dever*, 380 F.3d at 1073 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291-92 (1980)). A non-resident defendant's contacts with a forum state must be sufficient to cause the defendant to "reasonably anticipate being haled into court there." *Epps*, 327 F.3d at 648 (quoting *World-Wide Volkswagen*, 444 U.S. at 297).

There are two categories of minimum contacts with a state that may subject a defendant to jurisdiction in that forum: general jurisdiction and specific jurisdiction. Under a general jurisdiction approach, "a defendant may be subject to the forum state's exercise of personal jurisdiction if contacts with the state are continuous and systematic." *Id.* A state has specific personal jurisdiction over a defendant when the suit arises out of, or is related to, the defendant's contacts with the forum state. *Woodcock*, 444

F.3d at 956 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). Both theories of personal jurisdiction require "some act by which the defendant purposely avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

The Eighth Circuit has established a five-factor test for measuring minimum contacts for purposes of asserting personal jurisdiction over a defendant:

> (1) the nature and quality of [a defendant's] contacts with a forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) [the] convenience of the parties.

*Dever*, 380 F.3d at 1073-74 (quoting *Burlington Indus., Inc. v. Maples Indus., Inc.*, 97 F.3d 1100, 1102 (8th Cir. 1996)). Although the first three factors are "primary factors" and the remaining two are "secondary factors," the court will "look at all of the factors and the totality of the circumstances in deciding whether personal jurisdiction exists." *K-V Pharm.*, 648 F.3d at 592-93 (citation omitted).

Analysis of these factors demonstrates that personal jurisdiction is clearly lacking and NAGA's Complaint should be dismissed.

### a. The nature and quality of the contacts with the forum state

As specifically applied to this case, the question here is whether, by issuing a non-defamatory press release[23] and placing it on its website (maintained at its headquarters

---

[23] Plaintiff does not allege that NCAI defamed it. *See* Count 1 of Complaint at ¶¶ 83-96 at 15-17.

in Washington, D.C.), NCAI was given "fair warning" that it may be subjected to the jurisdiction of a foreign sovereign. *Zidon v. Pickrell*, 344 F. Supp. 2d 624, 628 (D.N.D. 2004) ("Under this factor, the primary issue is whether the non-resident defendants have fair warning that a particular activity may subject a person to the jurisdiction of a foreign sovereignty.") (citing *Gould v. P.T. Krakatau Steel,* 957 F.2d 573, 576 (8th Cir. 1992)).

Because NAGA's Complaint is premised on NCAI's placement of a news item on its website, discussion of whether such conduct would establish minimum contacts for purposes of personal jurisdiction is helpful; specifically, whether a web site may provide sufficient contacts to invoke jurisdiction. *See Lakin v. Prudential Securities, Inc.*, 348 F.3d 704, 710 (8th Cir. 2003) (discussing whether a web site may provide sufficient minimum contacts to invoke jurisdiction). While most of the cases analyzing the issue are focused on commercial activity (i.e., sales), one persuasive district court opinion—discussed at length in *Lakin*—described web sites in which "a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions" as "passive" web sites and that "[a] passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction." *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997); *Lakin*, 348 F.3d at 710-711 (discussing and quoting *Zippo*).

NCAI's conduct in placing the news item on its web site is passive and almost exactly like the conduct described in *Zippo*, which does not constitute grounds for exercising personal jurisdiction.

### b. The quantity of contacts

Plaintiff's Complaint does not identify any contacts between any of the Defendants and North Dakota. The only connection between this case and North Dakota appears to be the dubious claim that NAGA is incorporated in North Dakota, that its principal place of business is in North Dakota, and that one of its several corporate officers is domiciled in North Dakota. Complaint ¶ 1 at 6. There are no allegations in the Complaint of any conduct by any Defendant that occurred in or was directed at North Dakota.

NCAI has had contacts with North Dakota, but those have been in two primary contexts: First, NCAI has received memberships from Tribal Nations and individuals in North Dakota. Out of 574 federally-recognized Tribal Nations in the United States, there are five federally-recognized Tribal Nations and one Indian community located in North Dakota and, currently, only one of those tribes (the Turtle Mountain Band of Chippewa Indians) is an NCAI member. Blackwell Decl. at ¶ 5. Out of 1,097 individual memberships, only six members reside in North Dakota. *Id.* That NCAI has member Tribes and individual members in North Dakota is insufficient to support general or specific jurisdiction in North Dakota. *See Shell v. American Family Rights Ass'n*, 899 F. Supp. 2d 1035, 1052-53 (D. Colo. 2012) (facts that association solicits members in Colorado, has members in Colorado, and maintains web sites and advertised in Colorado is insufficient to establish personal jurisdiction without additional facts showing purposeful direction at Colorado); *see also Levine v. American Mensa, Ltd.*, 2020 WL 13574113 (N.D. Ga. 2020) (soliciting membership, collecting annual dues and providing services in Georgia is an insufficient basis for personal jurisdiction). On three occasions over the past 80 years,

16

NCAI has held its annual meeting in Bismarck, North Dakota, although none of the allegations in this matter arose from any of those meetings. Blackwell Decl. at ¶6.

Second, NCAI's General Assembly has, on occasion, adopted resolutions referencing North Dakota's Tribal Nations and aimed primarily at federal lawmakers or federal agencies in Washington, D.C. on issues of federal concern for those Tribal Nations. *Id.* at ¶7. There are likewise no allegations that this matter arose from any NCAI resolutions.

The quantity of contacts in these areas is insufficient to support personal jurisdiction over NCAI.

### c. The relation of the causes of action to the contacts

In analyzing whether specific jurisdiction comports with due process, the court must decide whether the defendant has minimum contacts with the forum state and "whether the plaintiffs' claims 'arise out of or relate to the defendant's contacts.'" *Kaliannan v. Liang*, 2 F.4th 727, 733 (8th Cir. 2021) (quoting *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021)).

In a recent case involving a trademark infringement claim, the Eighth Circuit emphasized that, where personal jurisdiction is premised on specific jurisdiction, a court looks *only* to a defendant's contacts related to the plaintiff's claims. *See Brothers and Sisters in Christ, LLC v. Zazzle, Inc.*, 42 F.4th 948, 952 (8th Cir. 2022) ("[I]n assessing specific jurisdiction, we look only to Zazzle's contacts with Missouri related to BASIC's claims.") (citation omitted). To establish specific jurisdiction, "there must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that

17

takes place in the forum State." *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 264 (2017) (citation omitted). "When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Id.* (citation omitted).

Plaintiff's claims against NCAI involve allegations that NCAI and the Commanders somehow conspired after an alleged defamatory communication to "control a narrative" involving the name change for the Commanders. None of the actions alleged in the Complaint are alleged to have taken place in North Dakota. Indeed, there is not even an allegation that any alleged defamation took place in North Dakota, and NCAI's non defamatory press release—a central focus of NAGA's allegations—was published on NCAI's website from its offices in Washington D.C.

None of NCAI's contacts with North Dakota are related to NAGA's claims in this matter and the third prong of the minimum contacts analysis is not satisfied.

### d. The interest of the forum state in providing a forum for its residents

NAGA's Complaint likewise fails on this prong of the minimum contacts inquiry. This factor is articulated as the "interest of the forum state in providing a forum *for its residents*." *Kaliannan*, 2 F.4th at 734 (emphasis in original) (quoting *Whaley v. Esebag*, 946 F.3d 447, 452 (8th Cir. 2020)). In opining on this factor, the Eighth Circuit has recognized that a forum state has an interest in providing a forum for resident corporations. *K-V Pharm.*, 648 F.3d at 595. In *Kaliannan*, the court found that this factor was not satisfied because "none of the Plaintiffs are North Dakota residents," which suggests that "the

forum state's interest is not implicated with respect to providing a forum for its residents." 2 F.4th at 734 (citation omitted).

In this case, Plaintiff NAGA is a non-resident Virginia corporation. NAGA claims to be incorporated in North Dakota. Complaint ¶ 1 at 6. According to records from the Commonwealth of Virginia's State Corporation Commission, NAGA is incorporated as a non-stock corporation in Virginia, formed on April 6, 2017. Murphy Decl. at ¶ 4; Murphy Decl. Exhibit 2. While it lists its principal place of business as a post office box in North Dakota, only one of the corporate officers (Eunice Davidson) lists an address in North Dakota. Murphy Decl. Exhibit 2. The other corporate officers and principals list addresses in New York, Texas, Colorado, and New Mexico. *Id.* The address for the registered agent for the corporation is in Fairfax, Virginia. *Id.*

Incorporation in Virginia is consistent with NAGA's other recent litigation effort. In a recent federal court action in the District of Colorado in which NAGA appeared as a plaintiff, NAGA alleged that it is "a section 501(c)(3) non-profit organization *organized under the laws of the State of Virginia*." Murphy Decl. Exhibit 3 (Complaint, ¶ 34 at 10-11, *Marez v. Polis, et al.*, No. 1:21-CV-02941-RMR-NYW (D. Colo. Nov. 2, 2021)) (emphasis added). The available evidence indicates that NAGA is, in fact, a Virginia corporation.

NAGA's current registration with the North Dakota Secretary of State shows that "Native American Guardians Association" is registered as a "trade name" and that its current registration expired on November 23, 2020. Murphy Decl. Exhibit 1. A suit may not be brought in North Dakota by a "trade name." *See* N.D. R. Civ. P. 17(a) (action must be prosecuted in the name of the real party in interest).

19

Even if one of NAGA's corporate officers lives in North Dakota, as alleged, the State of North Dakota has no interest in providing a forum for a Virginia corporation to pursue claims of defamation and conspiracy against a national inter-Tribal government organization—NCAI—and an NFL football club over alleged communications and events that did not occur in North Dakota. This prong of the minimum contacts test is also not satisfied in this matter.

### e. The convenience of the parties

All of the events alleged in Plaintiff's Complaint took place in Washington, D.C. or the State of Virginia and all of the parties are located in those jurisdictions. This factor does not favor either party, but the facts supporting this analysis weigh heavily against personal jurisdiction on all other factors.

### f. The Calder "effects" test

The Eighth Circuit has recognized the *Calder* "effects" test, when an intentional tort is alleged, as an additional factor to consider when evaluating a defendant's relevant contacts with a forum state. *Gen. Elec. Cap. Corp. v. Grossman*, 991 F.2d 1376, 1387 (8th Cir. 1993); *Hicklin Eng'g, Inc. v. Aidco, Inc.*, 959 F.2d 738, 739 (8th Cir. 1992); *Dakota Indus., Inc., v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1390–91 (8th Cir. 1991). This test is based upon the Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984). *Calder* was a libel action filed in California against Florida residents who were writers and editors of the National Enquirer. *Atkinson v. McLaughlin*, 343 F. Supp. 2d 868, 875 (D.N.D. 2004). The Supreme Court held that personal jurisdiction could be based on the effects of the defendant's actions, which were aimed at California, including knowledge that the

20

allegedly libelous articles would have a "devastating impact" on the plaintiff and the "brunt of the harm" would be suffered in California. *Id.* The Eighth Circuit uses the "effects test" as an additional factor to consider when evaluating a defendant's relevant contacts with the forum states. *Dakota Indus.*, 946 F.2d at 1391. ("We simply note that *Calder* requires the consideration of additional factors when an intentional tort is alleged.").

The *Calder* test has taken on new life in the Internet age. "When analyzing the 'effects test' in relation to Internet communications, several courts have held that a person's act of placing information on the Internet is not sufficient by itself to subject that person to personal jurisdiction in each State in which the information is accessed." *Atkinson*, 343 F. Supp. 2d at 876 (citations and internal quotation marks omitted). In one case, *Revell v. Lidov*, 317 F.3d 467 (5th Cir. 2002), a Texas resident brought an action against non-residents based upon an alleged defamatory article posted on an Internet bulletin board. *Id.* at 469. The Fifth Circuit concluded that Texas could not exercise jurisdiction "because the article did not refer to Texas, the article was not specifically directed at Texas readers, and the defendants did not know the plaintiff was a Texas resident." *Atkinson*, 343 F. Supp. 2d at 876 (describing *Revell*, 317 F.3d at 476).

The "effects test" requires conduct specifically directed at the forum state. For example, in *Zidon*, *supra*, this Court found personal jurisdiction under the effects test where it was clear that the defendant's Internet communications were directed toward the State of North Dakota. 344 F. Supp. 2d at 631-32 (citations omitted). The court wrote, "[t]he Web site reveals that the focus of the Web site was North Dakota. Pickrell knew

21

Zidon was a resident of North Dakota, and knew the 'brunt of the injury' would be felt in North Dakota." *Id.* at 632. Because the web site was targeted at North Dakota, the court held that the "effects test" was satisfied and weighed in favor of personal jurisdiction. *Id.*

Reviewing the conduct alleged in Plaintiff's Complaint against NCAI reveals that none of it was directed at North Dakota. Posting a non-defamatory press release on its web site about a name change for an NFL football team in Washington, D.C., in which the story does not mention NAGA or North Dakota, fails to satisfy this standard in any way and, once again, weighs against exercising personal jurisdiction.

. . .

The totality of circumstances shows that NCAI's limited contacts with North Dakota do not support this Court's jurisdiction over NCAI, and therefore the Complaint against NCAI should be dismissed.

### B.  Plaintiff's Civil Conspiracy Claim Is Not Plausible

Under North Dakota law, a civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another and an overt act that results in damages." *Wilkinson v. Bd. of Univ. and Sch. Lands*, 981 N.W.2d 853, 862 (N.D. 2023) (quoting *Burris Carpet Plus, Inc. v. Burris*, 785 N.W.2d 164, 179 (N.D. 2010)); *see Macquarie Bank Ltd. v. Knickel*, 723 F. Supp. 2d 1161, 1192 (D.N.D. 2010); *Jacam Chem. Co. 2013, LLC v. Shepard*, No. 1:19-CV-093, 2023 WL 22139, at *8 (D.N.D. Jan. 3, 2023). The underlying act itself must generally be actionable as a tort claim to support a civil conspiracy claim, and if the underlying tort

claim is dismissed, the civil conspiracy claim is defeated. *Id.*; *see Kuhn v. Chesapeake Energy Corp.*, No. 1:12-CV-086, 2012 WL 4442798, at *6 (D.N.D. Sept. 25, 2012) (laying out prima facie elements to civil conspiracy). Plaintiff has failed to state a plausible claim against NCAI at every step.

### 1. *Plaintiff Has Not Plausibly Alleged a Concerted Action to Commit a Tortious Act*

The Plaintiff has not plausibly alleged that there was an agreement or concerted action between NCAI and the other Defendants to commit a tortious act — a necessary element of a civil conspiracy. "To constitute a concerted action, the plaintiffs [need] to present evidence of a common plan to commit a tortious act, the participants knew of the plan and its purpose, and the participants took substantial affirmative steps to encourage the achievement of the result." *Kuhn*, 2012 WL 4442798, at *6. The Plaintiff's complaint, however, only contains "naked assertion[s] devoid of further factual enhancement." *Alexander WF*, 2015 WL 12803715, at *7 (quoting *Iqbal*, 556 U.S. at 678). There is not enough "factual content that allows the court to draw the reasonable inference" that NCAI is liable for any misconduct. *Kraft*, 600 F. Supp. 3d at 970.

The crux of Plaintiff's Complaint appears to be that NCAI and the Commanders entered into an agreement to defame Plaintiff on August 30, 2023, through the issuance of press releases. Complaint at ¶ 100 at 17. But, this is where the allegations fall apart and we are left with nothing but naked assertions. NCAI was allegedly solicited to "issue a press release showing continued support for the Commanders [sic] decision" to not return to its former name. Complaint at ¶ 71 at 13. There is no factual allegation that

NCAI was solicited to defame Plaintiff or commit some other tort against it. No, NCAI was allegedly solicited to shape the public's perception about the Commanders' choice to not return to its former name through the issuance of a press release. *Id.* NAGA concludes that NCAI's issuance of a press release — not defaming Plaintiff, but rather applauding the decision to avoid the former name — somehow "shows that NCAI was working in tandem with the Commanders" to defame NAGA. Complaint at ¶ 78 at 14. This non sequitur does not flow from the actual facts alleged as NCAI is not named in Count 1 — the defamation claim. *See* Complaint at ¶¶ 83-96 at 15-17.

The facts alleged do not present any "evidence of a common plan to commit a tortious act," that NCAI "knew of the plan and its purpose," or that it took any steps "to encourage the achievement of the result." *Kuhn*, 2012 WL 4442798, at *6 (D.N.D. Sept. 25, 2012). The facts presented here are in line with numerous cases likewise concluding that there must be sufficient evidence of a concerted action or agreement to succeed in a civil conspiracy case. *Peterson v. N. Dakota Univ. Sys.*, 678 N.W.2d 163, 174 (N.D. 2004) (no "evidence indicating there was an agreement" to commit an unlawful act or a lawful act by unlawful means); *see Schmitt v. MeritCare Health Sys.*, 834 N.W.2d 627, 635 (N.D. 2013) (holding plaintiff only had unsupported conclusory allegations about conspiracy); *Jacam Chem.*, 2023 WL 22139, at *9 (D.N.D. Jan. 3, 2023) (no evidence of agreement).

The only possible agreement alleged in the Complaint is one to shape the public's opinion about the Commanders' decision to not return to its former name. But just as competition is not "unlawful," utilizing First Amendment rights to free speech to issue a press release in support of long held positions is not unlawful. *Jacam Chem. Co.*, 2023 WL

22139, at *9  ("Competition is not unlawful and neither is offering a potential customer a better product, lower price, or better service."). NCAI has long held the stance that the Washington NFL team should change its name, and issuing a press release applauding that decision is far from unlawful.

Of particular note is this Court's decision in *KLX Energy Servs. LLC v. Telos Indus., Inc.*, No. 1:18-CV-00225, 2021 WL 9666530 (D.N.D. July 29, 2021). There, one oil company alleged that another oil company, its employee, and a distribution company conspired to misappropriate trade secrets. *Id.* at *1-2. Looking at the complaint, this Court concluded that the plaintiff "failed to provide any facts to plausibly show" the defendants "agreed on and acted in concert . . . to execute an unlawful scheme to misappropriate" the trade secrets. *Id.* at *6. "Simply asserting" that there was a distribution agreement was not enough to show there was an agreement to inflict a wrong, the Court concluded. *Id.* Instead, plaintiffs "failed to provide any facts to plausibly show" all of the defendants "knew or had reason to know the trade secrets were improperly obtained." *Id.* Likewise, in this case, there are no allegations that plausibly show that NCAI agreed to and acted in concert to defame NAGA. All the Complaint shows is that NCAI exercised its right to free speech on an issue that it has taken a public stance on for decades.

## 2.  *Plaintiff Has Not Alleged NCAI Acted To Defame It*

Not only has the Plaintiff not alleged that there was a concerted act or agreement to defame it as described above, it has not even alleged that NCAI defamed it at all. Complaint at ¶¶ 83-96 at 15-17 (Count 1 does not list NCAI). This is fatal to Plaintiff's claim because the "underlying act itself must generally be actionable as a tort claim to

support a civil conspiracy claim, and if the underlying tort claim is dismissed, the civil conspiracy claim is defeated." *Wilkinson v. Bd. of Univ. and Sch. Lands*, 981 N.W.2d 853, 862 (N.D. 2023). The only act that Plaintiff alleges NCAI has done is issue a press release supporting the Commanders' decision to not go back to their previous name. This is an exercise of free speech, not a tort.

Plaintiff has failed to plausibly allege any civil conspiracy by NCAI. Rather, the Complaint contains mere "naked assertion[s] devoid of further factual enhancement." *Alexander WF*, 2015 WL 12803715, at *7.

### C.  Plaintiff's § 1985(3) Claim Is Not Plausible

Plaintiff's bare assertions do not establish any of the necessary elements of its § 1985(3) claim. To establish the existence of conspiracy under § 1985(3), the plaintiff must prove:

> (1) that the defendants conspired, (2) with the intent to deprive [Plaintiff] of equal protection of the laws, or equal privileges and immunities under the laws, (3) that one or more of the conspirators did, or caused to be done, any act in furtherance of the object of the conspiracy, and (4) that [Plaintiff] was injured or deprived of having and exercising any right or privilege of a citizen of the United States.

*Mendoza v. U. S. Immigr. and Customs Enf't*, 849 F.3d 408, 421 (8th Cir. 2017); *see City of Omaha Emps. Betterment Ass'n v. City of Omaha*, 883 F.2d 650, 652 (8th Cir. 1989) ("*City of Omaha*").

Finally, a plaintiff must also allege the infringement of an independent federal right. *United Bhd. of Carpenters and Joiners of Am. v. Scott*, 463 U.S. 825, 833 (1983) (Section 1985(3) "provides no substantial rights itself[;]" . . . "[t]he rights, privileges, and

immunities that § 1985(3) vindicates must be found elsewhere"). Plaintiff's claims do not plausibly meet any of the elements necessary to establish a § 1985(3) claim against NCAI.

### 1. *Plaintiff Has Not Plausibly Alleged an Agreement Between NCAI, the Commanders, and Harris to Violate Plaintiff's Civil Rights*

To state a plausible claim under the first § 1985(3) element — that there was a conspiracy — a "plaintiff 'must allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement.'" *Kelly v. City of Omaha, Neb.*, 813 F.3d 1070, 1077 (8th Cir. 2016) (quoting *City of Omaha*, 883 F.2d at 652) ("*Kelly*"). This standard requires that "allegations of a conspiracy [be] pleaded with sufficient specificity and factual support to suggest a meeting of the minds directed toward an unconstitutional action." *Id.* at 1078 (quoting *Nelson v. City of McGehee*, 876 F.2d 56, 59 (8th Cir. 1989). In other words, a plaintiff must show that defendants reached some "understanding to violate [plaintiffs] rights." *Nelson*, 876 F.2d at 59 (citations and internal quotation marks omitted).

Just as Plaintiff cannot show an agreement for a civil conspiracy under North Dakota law, Plaintiff fails to allege any facts that show an agreement or meeting of the minds between NCAI, the Commanders, and Harris to violate Plaintiff's rights under § 1985(3). As a result, Plaintiff fails to meet the first and second elements required by *City of Omaha*, 883 F.2d at 652.

In its Complaint, NAGA only alleges a single interaction between Harris and NCAI. In this interaction, NAGA alleges that Harris solicited NCAI to issue a press release "on or about August 30, 2023." Complaint at ¶ 100 at 17.  NAGA points out that

on August 30, 2023, NCAI did issue a press release supporting the Commanders' decision to not return to its former name, and that on August 31, 2023, the Commanders issued their own press release affirming that decision. Complaint at ¶ 101-102 at 17-18. Plaintiff alleges no other facts regarding an agreement or meeting of the minds but simply makes the conclusory allegation that together these press releases prove NCAI, Harris, and the Commanders entered into an agreement to "silence NAGA entirely." Complaint at ¶ 107 at 19.

The Eighth Circuit has declined to find an agreement in situations where plaintiffs fail to allege particular and specific facts showing that defendants reached an agreement. In *Kelly*, the court found that the plaintiff's complaint made only a single "reference to any communication that allegedly took place" between defendants. 813 F.3d at 1078. For the *Kelly* court, the single allegation was insufficient for the court to find "that defendants reached a 'meeting of the minds' directed towards violating" the plaintiff's § 1985(3) rights. *Id.* Here, Plaintiff has alleged even fewer facts than the plaintiff in *Kelly* and no facts that demonstrate a "meeting of the minds" to violate Plaintiff's § 1985(3) rights. Plaintiff alleges that Harris solicited NCAI regarding a press release regarding the Commanders' previous name but fails to allege any meeting of the minds to violate Plaintiff's civil rights. Complaint at ¶ 100 at 17.

As discussed above, NCAI utilizing its free speech rights to issue a press release on a matter that it has taken a stance on for decades is not sufficient to show there was an agreement to violate NAGA's civil rights. At best, Plaintiff allegedly demonstrates that NCAI was aware of the Commanders' upcoming press release and that both press

releases shared the same disposition regarding the Commanders' decision to not return to its former name. The Eighth Circuit has held that "[m]ere knowledge of another's wrongdoing is insufficient to hold a party liable as a conspirator." *City of Omaha*, 883 F.2d at 653. Here, neither the press release itself nor knowledge of it amounts to any wrongdoing. Issuing a press release regarding long held institutional positions is protected speech, not an effort to silence, and certainly not an effort to violate civil rights. And if Plaintiff is relying on defamation for its § 1985(3) claim, this also fails as a matter of law. *White v. United States*, 791 F. Supp. 2d 156, 163 (D.D.C. 2011) (holding defamation is not actionable under § 1985(3) because there is no constitutional protection against defamation).

In every scenario, Plaintiff fails to prove how NCAI agreed to deprive Plaintiff of its § 1985(3) protected rights.

### 2. *Plaintiff's § 1985(3) Claim Should Be Dismissed Because It Has Not Alleged Any Invidiously Discriminatory Animus at All*

Plaintiff's § 1985(3) claim must fail because it does not allege that NCAI held or directed any invidiously discriminatory animus towards Plaintiff based on its status as a protected class under § 1985(3). Even more, Plaintiff has failed to allege any invidiously discriminatory animus at all by NCAI. To state a plausible § 1985(3) claim, a plaintiff must prove that the alleged conspiracy is fueled by defendant's animus against a class § 1985(3) protects. *McDonald v. City of Saint Paul*, 679 F.3d 698, 706 (8th Cir. 2012); *see also Keefe v. City of Minneapolis*, 785 F.3d 1216, 1224 (8th Cir. 2015) ("Keefe fails to direct us to anything

in the record showing that a conspiracy existed that was fueled by some class-based, invidiously discriminatory animus."); *Means v. Wilson*, 522 F.2d 833, 839 (8th Cir. 1975).

Classes traditionally protected by § 1985(3) include those based upon race, gender, and national origin, among others. *McDonald*, 679 F.3d at 707. The Supreme Court has recognized that the class must be "something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269 (1993). And courts are cognizant that the animus element is to ensure that § 1985(3) is not used as a "general federal tort law." *Dornheim v. Sholes*, 430 F.3d 919, 924 (8th Cir. 2005).

In *Boone v. Federal Express Corporation*, the court found that neither the defendants' behavior nor anything in email messages exchanged between defendants gave rise to any indication of racial animus towards the plaintiff. *Boone v. Federal Express Corporation*, 59 F.3d 84, 87 (8th Cir. 1995). As such, the Eighth Circuit held that it was proper to dismiss Boone's § 1985(3) claim. *Id.* Plaintiff here does not allege a single fact regarding NCAI's behavior, actions, or statements directed towards or made about Plaintiff, let alone allegations of any NCAI behavior, actions, or statements that could suggest animus towards Plaintiff. In *Boone*, the court was able to review and consider at least some type of action the defendants had taken concerning the plaintiff. Here, Plaintiff has given the Court nothing. NCAI cannot be found to harbor any animus toward NAGA when NAGA has failed to allege any evidence of animus at all. Plaintiff's bare allegations include no factual support to show any animus.

Even if NAGA plausibly alleged that NCAI harbored animus, it has not plausibly alleged any facts showing that NCAI holds or directed any animus towards Plaintiff because of Plaintiff's membership in any § 1985(3) protected class. Although it is unclear which § 1985(3) class Plaintiff claims to hold membership in, Plaintiff seems to allege that its § 1985(3) class is based on its national origin as American Indians. Complaint at ¶ 107 at 19. NCAI does not dispute that American Indians and national origin are each a protected class under § 1985(3). However, Plaintiff does not allege any facts that NCAI harbors animus towards Plaintiff because of its national origin or because it is a class of American Indians. To the contrary, NCAI's mission is protect and enhance Tribal Nation sovereignty and treaty rights; secure traditional laws, cultures, and ways of life for Native descendants; promote a common understanding of the rightful place of Tribal Nations among domestic American governments and the international community of governments; an improve the quality of life for Native Communities and peoples. *See supra* Section II(A) at 2.

At best, all Plaintiff's Complaint establishes is that it and NCAI differ in their institutional positions towards the use of Native mascots and imagery. NCAI's institutional position is based on the resolutions its members have long agreed on and the scientific evidence that Native mascots and imagery cause real, documented harm to the mental health of American Indian and Alaska Native youth. *See supra* Section II(C) at 4-8. That NCAI holds a different viewpoint than NAGA does not demonstrate that NCAI holds any animus towards it based on its membership in a § 1985(3) protected class. Further, NAGA does not even allege that NCAI harbors animus towards it because of

differing institutional positions. There can be no animus when Plaintiff does not even mention NCAI's actions or animus at all.

Section 1985(3) claims are properly dismissed "for failure to state a claim under the standards established in *Iqbal*" when plaintiffs fail to plead "any facts plausibly alleging" that an alleged conspiracy is fueled by "racial or class-based discriminatory animus." *Camick v. Holladay*, 758 Fed. Appx. 640, 646 (10th Cir. 2018). Plaintiff has failed to meet that standard here and thus its § 1985(3) claim should be dismissed.

### 3. *Plaintiff Has Not Plausibly Alleged It Has Been Deprived of Its Civil Rights or Injured at All*

NAGA has failed to sufficiently plead which constitutional rights the alleged conspiracy has deprived it of and has failed to sufficiently plead how it has been injured. Section 1985 grants no substantive, stand-alone rights; it only provides a remedy. The source of the right or laws violated "must be found elsewhere." *Scott*, 463 U.S. 825, 833 (1983). The crux of Plaintiff's allegations are that NCAI conspired to "silence" Plaintiff. Complaint at ¶107 at 19. As discussed above, there is no plausible conspiracy. Beyond that, the Complaint does not plausibly show how Plaintiff was "silenced" or that allegedly being silenced by a private party implicates any constitutional right. It is unclear how NCAI utilizing its free speech to issue a press release has the effect of silencing NAGA, or how it prevents NAGA from utilizing its own free speech rights. And if NAGA is relying on defamation for its § 1985(3) claim, this also fails as a matter of law. *White*, 791 F. Supp. 2d at 163  (holding defamation is not actionable under § 1985(3) because there is no constitutional protection against defamation).

32

Next, Plaintiff baldly asserts NCAI deprived it of its property right to operate its nonprofit and of its right to defend its heritage. Complaint at ¶¶ 108-109 and ¶111 at 19. These conclusory allegations are just that — threadbare recitals, at best, supported by conclusory statements that do not meet the plausibility requirement. *Kraft,* 600 F. Supp. 3d at 970. A complaint does not "suffice if it tenders a naked assertion devoid of further factual enhancement." *Alexander WF*, 2015 WL 12803715, at *7 (quoting *Iqbal*, 556 U.S. at 678); *see Faulk v. City of St. Louis, Missouri*, 30 F.4th 739, 747 (8th Cir. 2022) ("Without some further factual enhancement [a naked assertion of conspiracy] stops short of the line between possibility and plausibility of 'entitlement to relief.'") (cleaning up *Twombly*, 550 U.S. at 557) (brackets in original). Plaintiff has failed to plausibly demonstrate it suffered any constitutional violations or injuries.

Because Plaintiff has failed to prove any of the elements required to establish a § 1985(3) claim, the Court should dismiss this claim.

## V.    CONCLUSION

For the foregoing reasons, NCAI respectfully requests that the Court find that it does not have personal jurisdiction over NCAI, and that it dismiss Plaintiff's claims against NCAI for failure to state a claim for which relief can be granted.

Dated: December 1, 2023.

/s/ Matthew L. Campbell

Matthew L. Campbell (CO Bar No. 40808)
Beth Margaret Wright (CO Bar No. 55339)
NATIVE AMERICAN RIGHTS FUND
250 Arapahoe Ave.
Boulder, CO 80302
Tel. (303) 447-8760
mcampbell@narf.org
wright@narf.org

*Attorneys for NATIONAL CONGRESS OF
AMERICAN INDIANS*