UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| NATIVE AMERICAN GUARDIAN'S ASSOCIATION,<br><br>         Plaintiff,<br><br>    v.<br><br>WASHINGTON COMMANDERS, JOSH HARRIS, MATTHEW LAUX, and THE NATIONAL CONGRESS OF AMERICAN INDIANS,<br><br>         Defendants. | Case No. 3:23-cv-186<br><br>Hon. Peter D. Welte |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS WASHINGTON COMMANDERS AND JOSH HARRIS'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND, ALTERNATIVELY, FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................1

FACTS AS ALLEGED IN THE COMPLAINT ......................................................2

LEGAL STANDARDS ......................................................................................4

    A.    Standard on a Motion to Dismiss a Claim Under Fed. R. Civ. P. 12 (b)(2). ..........4

    B.    Standard on a Motion to Dismiss a Claim Under Fed. R. Civ. P 12 (b)(6). ...........5

        1.    To Defeat a Rule 12(b)(6) Motion a Plaintiff Must Plead a Plausible Claim. .......................................................................5

        2.    Rule 12(b)(6) Motions Play an Especially Important Role in Early Elimination of Unmeritorious Defamation Suits. .........................................6

ARGUMENT ..................................................................................................7

I.    PLAINTIFF'S COMPLAINT MUST BE DISMISSED BECAUSE THIS COURT LACKS PERSONAL JURISDICTION OVER THE COMMANDERS DEFENDANTS ..............................................................................................7

    A.    The Court Lacks General Jurisdiction Over the Commanders Defendants. ...........8

        1.    The Club Does Not Have Continuous and Systematic Contacts with North Dakota. ..............................................................................9

        2.    Harris Has No Contacts with North Dakota. ...............................................11

    B.    The Court Lacks Specific Jurisdiction Over the Commanders Defendants. .........11

        1.    The Nature and Quality of the Commanders Defendants' Contacts with North Dakota are Insufficient to Establish Specific Jurisdiction. ..............................................................................12

            a.    The Club's Nearly Non-Existent Contacts with North Dakota are Insufficient to Establish Specific Jurisdiction. ........... 13

            b.    Harris's Lack of Any Contacts with North Dakota Forecloses Any Argument of Specific Jurisdiction. .................... 13

        2.    The Quantity of the Commanders Defendants' Contacts Cannot Establish Specific Jurisdiction. ..................................................14

        3.    Any of the Commanders Defendants' Contacts with North Dakota are Unrelated to This Lawsuit. ..................................................14

        4.    North Dakota Has No Interest in This Matter. ............................................15

        5.    North Dakota is an Inconvenient Forum for the Parties. ..........................16

    C.    Application of the Calder Effects Test Further Demonstrates This Court Lacks Personal Jurisdiction Over the Commanders Defendants. ..........................16

II.     ALTERNATIVELY, THE COURT SHOULD DISMISS THE COMPLAINT
        WITH PREJUDICE BECAUSE PLAINTIFF FAILS TO STATE A CLAIM
        UPON WHICH RELIEF CAN BE GRANTED ..............................................17

        A.      The First Amendment's Broad Protections for Public Debate Restrict
                Defamation Claims Such As NAGA's. ....................................................18

        B.      The Allegation That Laux Called NAGA a "Fake Group" Is Not
                Actionable Because It Does Not Convey Objective Truth. ...................21

                1.      Laux's Statement Must be Read in the Context of His Full Text
                        Exchanges and the National Public Controversy Over the Club's
                        Name Which Shows It Was Not an Assertion of Fact. ..............21

                2.      Because the Challenged Statement Is Susceptible to Multiple
                        Meanings, It Is Also Too Loose and Imprecise to Be an Assertion
                        of Fact and Therefore NAGA's Defamation Claim Must Be
                        Dismissed. .................................................................................24

                3.      The Allegation That Laux Called NAGA a Fake Group Is Also
                        Non-Actionable Opinion and Therefore Its Defamation Claim
                        Must Be Dismissed. ...................................................................26

        C.      NAGA Has Failed to Plausibly Allege That Laux or the Commanders
                Published His Statement With Actual Malice and Therefore Its
                Defamation Claim Must Be Dismissed.....................................................28

        D.      The Complaint Fails to State a Claim for Civil Conspiracy and Therefore
                NAGA's Claim Must Be Dismissed. .......................................................31

                1.      The Complaint Fails to Allege Plausibly an Agreement to Commit
                        an Underlying Wrong. ................................................................32

                2.      The Complaint Fails to Allege Plausibly an Agreement or That
                        Defendants Acted in Concert with Each Other..........................32

                3.      The Complaint Fails to Allege Plausibly Any Overt Acts in
                        Furtherance of an Unlawful Conspiracy. ...................................33

                4.      The Complaint Fails to Allege Plausibly That Any Purported
                        Conspiracy Caused Plaintiff Damages........................................33

        E.      The Complaint Fails to State a Claim for Violation of 42 U.S.C. § 1985(3)
                and Therefore It Must Be Dismissed. ......................................................34

                1.      Under 42 U.S. § 1985(3), First and Fourteenth Amendment Rights
                        Are Not Protected Against Private Interference. .......................35

                2.      Plaintiff Does Not Plausibly Allege That the Count III Defendants
                        Conspired with Each Other........................................................36

                3.      Plaintiff Does Not Plausibly Allege That the Count III Defendants
                        Acted with Discriminatory Animus. ..........................................37

4.      Plaintiff Does Not Plausibly Allege That the Count III Defendants
        Committed Any Act in Furtherance of the Object of the Alleged
        Conspiracy. ..................................................................................38

5.      The Complaint Fails to Plausibly Allege That Any Purported
        Conspiracy Caused Plaintiff Damages.........................................................38

CONCLUSION.....................................................................................................................39

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Arkansas Right to Life State PAC v. Butler*,
    146 F.3d 558 (8th Cir. 1998) ...................................................................39

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................................5

*Aviation Charter, Inc., v. Aviation Rsch. Grp./US*,
    416 F.2d 864 (8th Cir. 2005) ...............................................................19, 21

*Ayyadurai v. Floor 64, Inc.*,
    270 F.Supp.3d 343 (D. Mass. 2017) .........................................................23

*Bauer v. Ford Motor Credit Co.*,
    No. Civ. 00-389, 2000 WL 34494820 (D. Minn., June 27, 2000).........................18

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................................5, 6

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*,
    582 U.S. 255 (2017)..................................................................................8, 15

*Brookins v. Caterpillar Inc.*,
    No. 3:18-cv-129, 2019 WL 1274932 (D.N.D. Jan. 11, 2019) ...................3

*Bros. & Sisters in Christ, LLC v. Zazzle, Inc.*,
    42 F.4th 948 (8th Cir. 2022) ...........................................................15, 16, 17

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985)......................................................................................8

*Calder v. Jones*,
    465 U.S. 783 (1984).............................................................................16, 17

*Campbell v. Citizens for Honest Gov't*,
    255 F.3d 560 (8th Cir. 2001) .............................................................25, 26, 30

*Chambers v. Travelers Cos.*,
    668 F.3d 559 (8th Cir. 2012) .............................................................20, 21, 24

*Concepcion v. Off. of Comm'r of Baseball*,
    No. 22-cv-1017, 2023 WL 4110155 (D.P.R. May 31, 2023) ...................10

iv

*Condron v. McKennan*,
　No. 4:21-CV-04135-RAL, 2023 WL 6388014 (D.S.D. Sep. 29, 2023) .................................26

*DakColl, Inc. v. Grand Central Graphics, Inc.*,
　352 F.Supp.2d 990 (D.N.D. 2005) ...........................................................................................4

*Davis v. Jefferson Hosp. Ass'n*,
　685 F.3d 675 (8th Cir. 2012) ....................................................................................36, 37, 38

*Deupree v. Iliff*,
　860 F.2d 300 (8th Cir. 1988) ..................................................................................................23

*Dever v. Hentzen Coatings, Inc.*,
　380 F.3d 1070 (8th Cir. 2004) .......................................................................................4, 5, 7, 8

*Dilworth v. Dudley*,
　75 F.3d 307 (7th Cir. 1996) ....................................................................................................27

*East Coast Test Prep LLC v. Allnurses.com, Inc.*,
　307 F.Supp.3d 644 (D. Minn. 2017) .......................................................................................26

*Edwards v. City of Florissant*,
　58 F.4th 372 (8th Cir. 2023) .............................................................................................5, 37

*Energy Transfer Equity, LP v. Greenpeace Int'l*,
　No. 1:17-cv-00173-BRW, 2018 WL 4677787 (D.N.D. July 24, 2018) .................................39

*Ernst v. Bassett*,
　521 So.2d 414 (5th Cir. 1988) ................................................................................................27

*Farber v. Jeffreys*,
　941 N.Y.S.2d 537 (N.Y. Sup. Ct. 2011), (App. Dist. 2013)...................................................26

*Faulk v. City of St. Louis, Missouri*,
　30 F.4th 739 (8th Cir. 2022) ..................................................................................................36

*Favre v. Sharpe*,
　No. 2:23-cv-42-KS-MTP, 2023 WL 7132949 (S.D. Miss., Oct. 30, 2023)............................19

*Federer v. Gephardt*,
　363 F.3d 754 (8th Cir. 2004) ..................................................................................................36

*Grawitch v. Charter Commc'ns., Inc.*,
　750 F.3d 956 (8th Cir. 2014) ..................................................................................................30

*Gray v. St. Martin Press. Inc.*,
　221 F.3d 243 (1st Cir. 2000)...................................................................................................27

*Great Am. Fed. Savs. & Loan Ass'n v. Novotny*,
    442 U.S. 366 (1979)........................................................................35

*Greenbelt Coop. Pub'lg Ass'n v. Bressler*,
    398 U.S. 6 (1970)....................................................................19, 30

*Hammer v. Osage Beach*,
    318 F.3d 832 (8th Cir. 2003) ..................................................21, 23

*Hansen v. Scott*,
    645 N.W.2d 223 (N.D. 2002) ........................................................7

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989)........................................................................31

*Hicklin Eng'g, Inc. v. Aidco, Inc.*,
    959 F.2d 738 (8th Cir. 1992) .......................................................17

*Horsley v. Rivera*,
    292 F.3d 695 (11th Cir. 2002) ....................................................19

*Horst v. Abused Adult Res. Ctr.*,
    No. 1:19-CV-243, 2020 WL 1466199 (D.N.D. Mar. 26, 2020) ..............................................38

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945)..........................................................................7

*Johnson v. Arden*,
    614 F.3d 785 (8th Cir. 2010) ...................................................9, 16

*Johnson v. Woodcock*,
    444 F.3d 953 (8th Cir. 2006) ............................................8, 11, 12

*K-V Pharm. Co. v. J. Uriach & CIA, S.A.*,
    648 F.3d 588 (8th Cir. 2011) .......................................................15

*Kahl v. Bureau of Nat'l Affairs, Inc.*,
    856 F.3d 106 (D.C. Cir. 2017)......................................................6

*Kaliannan v. Hoong Liang*,
    2 F.4th 727 (8th Cir. 2021) .........................................................15

*Kaveh Afrasiabi v. UPI*,
    561 F.Supp.3d 1 (D. Mass. 2021) ...............................................20

*Kelly v. City of Omaha, Neb.*,
    813 F.3d 1070 (8th Cir. 2016) ................................................33, 37

*Kraft v. Essential Health, Innovis Health, LLC*,
   600 F.Supp.3d 965 (D.N.D. 2021) ..................................................................5, 36

*Krinsky v. Doe 6*,
   159 Cal.App.4th 1154 (Cal. Ct. App. 2008) .........................................................27

*Lauderback v. Am. Broad. Cos.*,
   741 F.2d 193 (8th Cir. 1984) ................................................................20, 24, 27

*Laurence v. Evans*,
   573 So.2d 695 (Miss. 1990) ...............................................................................23

*Leon v. Murphy*,
   988 F.2d 303 (2d Cir. 1993) ...............................................................................38

*Levinsky's, Inc. v. Wal-Mart Stores, Inc.*,
   127 F.3d 122 (1st Cir. 1997) ..............................................................................20

*Manton v. California Sports, Inc.*,
   493 F.Supp. 496, 496-98 (N.D. Ga. 1980) ..........................................................9

*Mattel, Inc. v. MCA Recs., Inc.*,
   296 F.3d 894 (9th Cir. 2002) ..............................................................................26

*McIntosh v. Capital Cities/ABC, Inc.*,
   N.Y.L.J. IA Part 8 p. 2 (Sup. Ct. Kings Cty., Nov. 9, 1995) ..................................27

*Meier v. Novak*,
   338 N.W.2d 631 (N.D. 1983) ..............................................................................20

*Metcalfe v. KFOR-TV*,
   828 F.Supp. 1515 (W.D. Okla. 1992) ...........................................................24, 27

*Michel v. NYP Holdings, Inc.*,
   816 F.3d 686 (11th Cir. 2016) .............................................................................6

*Milkovich v. Lorain Journal Co.*,
   497 U.S. 1 (1990)...............................................................................................19

*Mitchell v. Random House, Inc.*,
   703 F.Supp. 1250 (S.D. Miss. 1988)....................................................................6

*Moore v. City of Desloge*,
   647 F.3d 841 (8th Cir. 2011) ..............................................................................36

*Nat'l Fed'n of the Blind v. Pryor*,
   258 F.3d 851 (8th Cir. 2001) ..............................................................................35

*Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*,
   951 F.3d 952 (8th Cir. 2020) ............................................................29

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964).........................................................................18

*NHH Inv'r. Grp. v. DFH Watford, LLC*,
   No. 4:15-cv-027, 2015 WL 12867309 (D.N.D. Oct. 8, 2015).................39

*Nuevos Destinos, LLC v. Peck*,
   No. 3:19-CV-00045, 2019 WL 6481441 (D.N.D. Dec. 2, 2019) .............5

*Omaha Emps. Betterment Ass'n v. City of Omaha*,
   883 F.2d 650 (8th Cir. 1989) .....................................................33, 37

*Payne v. Office of the Commissioner of Baseball*
   No. 15-cv-03229-YGR, 2016 WL 1394369, (N.D. Cal. Apr. 8, 2016) ....................9

*Penrose Hill, Ltd. v. Mabray*,
   479 F.Supp.3d 840 (N.D. Cal. 2020) ...............................................24

*Peterson v. N. Dakota Univ. Sys.*,
   678 N.W.2d 163 (N.D. 2004) .........................................................32

*Phantom Touring, Inc. v. Affiliated Publ'ns*,
   953 F.2d 724 (1st Cir. 1992)................................................24, 25, 27

*Polish Am. Immigr. Relief Comm., Inc. v. Relax*,
   189 A.D.2d 370 (N.Y. App. Div. 1993) ...........................................27

*Pope v. ESA Servs.*,
   406 F.3d 1011 (8th Cir. 2005) .......................................................18

*Reeder v. Carroll*,
   759 F.Supp.2d 1064 (N.D. 2010).....................................................20

*Riemers v. Mahar*,
   748 N.W.2d 714 (N.D. 2008) ...............................................28, 29, 30

*Rochling v. Dep't of Veterans Affairs*,
   725 F.3d 927 (8th Cir. 2013) .........................................................39

*Schatz v. Republican State Leadership Comm.*,
   669 F.3d 50 (1st Cir. 2012)..............................................................6

*Schmidt v. MeritCare Health Sys., Dakota Clinic, Ltd.*,
   834 N.W.2d 627 (N.D. 2013) ....................................................19, 21

*Secrist v. Harkin*,
  874 F.2d 1244 (8th Cir. 1989) ...................................................................19, 21, 25

*Senne v. Kansas City Royals Baseball Corp.*,
  105 F.Supp.3d 981 (N.D. Cal. 2015) .................................................................9, 10

*Sican v. JBS S.A.*,
  No. 4:22-cv-00180-RGE-HCA, 2023 WL 2643851 (S.D. Iowa Mar. 23, 2023) ...................30

*St. Croix Printing Equip., Inc. v. Sexton*,
  No. 06-4273, 2008 WL 3412090 (D. Minn. Aug. 8, 2008) ........................................31

*Stanton v. St. Jude Med., Inc.*,
  340 F.3d 690 (8th Cir. 2003) .........................................................................12

*Stevens v. Zeco, Inc.*,
  No. 1:15-cv-078, 2017 WL 4618272 (D.N.D. Apr. 14, 2017) ..................................36

*Stoltz v. Cty of Lancaster*,
  No. 08-CV-5622, 2011 WL 815709 (E.D. Penn., March 7, 2011)..............................27

*Sullivan v. Tagliabue*,
  785 F.Supp. 1076 (D.R.I. 1992)........................................................................9

*Turkish Coal of Am., Inc. v. Bruininks*,
  678 F.2d 617 (8th Cir. 2012) .....................................................................20, 21

*Vindman v. Trump*,
  No. CV 22-257 (JEB), 2022 WL 16758575 (D.D.C. Nov. 8, 2022) .............................6

*W. Washington Cty Emergency Med. Servs. v. Washington Cty*,
  967 F.2d 1252 (8th Cir. 1992) .......................................................................36

*Walden v. Fiore*,
  571 U.S. 277 (2014).................................................................................14, 15

*Washington Post Co. v. Keogh*,
  365 F.2d 965 (D.C. Cir. 1966) ........................................................................6

*Wilkinson v. Bd. of Univ. & Sch. Lands*,
  981 N.W.2d 853 (N.D. 2022) ......................................................................31, 32

*Yauncy v. Hamilton*,
  786 S.W.2d 854 (Ky. 1989)...........................................................................26

*Zidon v. Pickrell*,
  344 F.Supp.2d 624 (D.N.D. 2004).....................................................................12

**Statutes**

28 U.S.C. § 1332(a)(1) ....................................................................................7

42 U.S.C. § 1985(3) ..........................................................................34, 35, 37

N.D. Cent. Code § 14-02-03 ..........................................................................18

**Other Authorities**

U.S. Constitution Fourteenth Amendment .....................................17, 35, 36

Fed. R. Civ. P. 4(k)(1)(A) ...............................................................................7

Fed. R. Civ. P. 12 (b)(2) ....................................................................1, 4, 5, 7

Fed. R. Civ. P. 12 (b)(6) ....................................................................1, 5, 6, 18

N.D. R. Civ. P. 4(b)(2) ...............................................................................7, 14

U.S. Constitution First Amendment................................................... *passim*

## PRELIMINARY STATEMENT

Pursuant to Federal Rules of Civil Procedure 12(b)(2) and (6), Defendants Washington Commanders[1] and Josh Harris (together the "Commanders Defendants"), submit this memorandum in support of their motion to dismiss the Complaint of Plaintiff Native American Guardian's Association ("Plaintiff" or "NAGA") for lack of personal jurisdiction and failure to state a claim upon which relief can be granted. Plaintiff—a Virginia corporation claiming to be a North Dakota corporation[2]—has sued the Commanders Defendants, including for an allegedly defamatory text message transmitted by another defendant, Matthew Laux, from Maryland to a third party somewhere in the Washington D.C. area. Plaintiff fails to meet its burden to demonstrate the basis for personal jurisdiction over the Commanders Defendants. As detailed below, Plaintiff's conclusory allegations and unsupported claims of conspiracies and racial animus, see Complaint (Dkt. 1) pp. 3-5, ¶¶ 56, 65, 67-68, Counts II and III, cannot camouflage the uncontestable fact that the Commanders Defendants do not have the constitutionally mandated minimum contacts necessary to subject them to the jurisdiction of this Court. This case should be dismissed for lack of personal jurisdiction over the Commanders Defendants. Alternatively, NAGA's Complaint should be dismissed with prejudice for failure to state a claim upon which relief can be granted. NAGA's purported defamation claim (Count I) fails to allege plausibly that the statement it challenges, Laux's August 29, 2023 text message to one person, "You understand

---

[1] The "Washington Commanders" is not an organized entity. The team entity is Pro-Football LLC d/b/a Washington Commanders. Pro-Football, LLC d/b/a Washington Commanders is organized under the laws of Maryland and has its principal place of business in Ashburn, Virginia. Declaration of Amina Bulman ("Bulman Decl."), at ¶ 8. For clarity, Pro-Football, LLC d/b/a Washington Commanders is referred to hereinafter as "Commanders" or the "Club".

[2] Contrary to Plaintiff's allegation that it is a North Dakota corporation (Dkt. 1 ¶ 1), according to the Declaration of Thomas L. Murphy in Support of the National Congress of American Indians' Motion to Dismiss, (Dkt. 23) NAGA (i) was incorporated in Virginia in 2017; and (ii) represented to a court as recently as November 2, 2021 that it is "organized under the laws State of Virginia" (*Id.* at ¶ 6, and Ex. 3). For purposes of this motion, the Commanders Defendants do not repeat, but incorporate and join in the arguments in the National Congress of American Indians' Memorandum in Support of Motion to Dismiss (Dkt. 21) pp. 1-2, 9-10, 18-20.

the people that started this petition is a fake group right?", is a statement of provable fact. The term "fake group" is: (i) so imprecise and broad that it cannot as a matter of law be proven true or false; (ii) is protected and inactionable opinion; and (iii) has not been pled plausibly with facts that could prove by clear and convincing evidence that Laux and the Commanders published the statement with the constitutionally required "actual malice." Therefore, for any of these separate and independent reasons, NAGA's purported defamation claim falls far short of the protections mandated by the First Amendment to the U.S. Constitution and must be dismissed with prejudice. Plaintiff's claims for civil conspiracy (Count II) and conspiracy to interfere with civil rights (Count III) fail to allege plausibly that any of the Defendants reached an agreement to do anything (let alone to commit wrongdoing), or that Plaintiff was harmed as a result. Further, as to Count III, Plaintiff has failed to allege plausibly that the Commanders or Harris are state actors, or that any of Plaintiff's constitutional rights have been violated.

## FACTS AS ALLEGED IN THE COMPLAINT

Plaintiff is a nonprofit organization that seeks to further Native American cultural and ethnic awareness. Dkt. 1 ¶ 1. Defendant National Congress of American Indians ("NCAI") is a nonprofit organization that advocates for Native Americans, serving the broad interests of Tribal Nations and Native people. *Id.* at ¶¶ 5, 12, 240. The Washington Commanders[3] is a National Football League team, which the Complaint alleges is located in Baltimore, Maryland. *Id.* at ¶ 2.[4] The Complaint further alleges Josh Harris, at all relevant times, owned and operated the Commanders. *See id.* at ¶ 3. Defendant Matthew Laux is a premium seat sales manager for the

---

[3] See n.1 supra. An ownership group led by Josh Harris acquired the National Football League team franchise known as the Washington Commanders on July 21, 2023. Declaration of Josh Harris ("Harris Decl."), at ¶ 7. Prior to 2020, the team was known as the Washington Redskins. Bulman Decl. at ¶ 11. From 2020 to February 2022, the team was known as the Washington Football Team. *Id.* at ¶¶ 12, 13. In February 2022, the prior owner of the franchise changed the name of the team to the "Washington Commanders." *Id.* at ¶ 13. Harris Decl. at ¶ 14.

[4] The Club is not located in Baltimore.  The Club's principal place of business is Ashburn, Virginia.  Bulman Decl. at ¶ 8.

Washington Commanders. *Id.* at ¶¶ 4, 47.

Defendant NCAI publicly advocated that using "Redskins" as the team name is offensive and disrespectful to Native American culture. *Id.* at ¶ 26. NAGA publicly advocated a different view: that the Redskins name honors the Native American culture. *Id.* at ¶ 34. To further its advocacy, in the summer of 2023, NAGA "championed" a petition on Change.org to demand for the "Washington Commanders" to change the team name back to the "Redskins." *Id.* at ¶ 30; Declaration of Laura Martin ("Martin Decl."), ¶ 4, and Exhibit A ("Change The Washington Commanders back to The Washington Redskins," hereafter "Petition").[5] The Petition championed by NAGA states, in part:

> We[] are passionate supporters of the Washington Redskins and its rich history. We write to you today as a collective voice, urging you to reconsider the recent name change from the Redskins to the Commanders. We believe that restoring the original name, the Redskins, is the right decision for the team, its loyal fanbase, and the legacy it represents. . . . Changing the name abruptly disregards the positive legacy that the Redskins name has built over the years and disorients the passionate fans who have invested their emotions, time and unwavering support in the team.

*Id.* The Petition passionately expressed that it "firmly believe[s] that there are alternative ways to honor and respect Native American heritage without erasing it" and that "reclaiming the Redskins name" will "promote cultural appreciation, address misconceptions, and work towards a more inclusive society." *Id.* The Petition went viral and received over 130,000 signatures. Dkt. 1 ¶¶ 31, 32. NAGA advocates "that the confusion surrounding the Redskin name is an opportunity to educate through discourse," and remains actively involved in fueling the ongoing public debate through its activism on this issue. *Id.* at ¶ 35.

While NAGA's advocacy for changing the name back to Redskins ensued, on August 29,

---

[5] The Court may consider the attached Petition because it is referenced throughout the Complaint. *See Brookins v. Caterpillar Inc.*, No. 3:18-cv-129, 2019 WL 1274932, at *3 (D.N.D. Jan. 11, 2019), *report and recommendation adopted*, No. 3:18-CV-129, 2019 WL 1281277 (D.N.D. Feb. 15, 2019) (the district court may consider documents incorporated by reference in the complaint) (citation omitted).

2023, Laux engaged in a series of text messages with former luxury box owner, Christina King, seeking that she purchase box seats for the upcoming season. *Id.* at ¶¶ 47, 52. NAGA alleges that King boycotted the team in 2020 because of the name change. *Id.* at ¶ 48. During their text message exchange, King "informed Mr. Laux of NAGA's petition" to change the name of the team back to the Redskins. *Id.* at ¶ 50. Laux responded "[y]ou understand the people that started this petition is a fake group right?" *Id.* at ¶ 51. The next day, an unnamed "source" provided the private text message exchange between King and Laux to Fox News. *Id.* at ¶ 53.

Plaintiff alleges that Laux's statement is racist and false, *id.* at ¶¶ 56, 57, demonstrates that the Defendants "tried to silence NAGA's viewpoint by casting doubt on NAGA and its members' legitimacy as 'real' Native Americans," *id.* at ¶ 60, called "NAGA and its members 'con artists'''" and "suggest[ed] that NAGA and its members are committing fraud" by falsely assuming it was not a 501(c)(3) organization. *Id.* at ¶¶ 89, 91.

On August 30, 2023, a representative for the Commanders publicly reaffirmed the team's decision to not use the Redskins name. *Id.* at ¶ 70. That same day, NCAI issued a press release in support of the Commanders' decision not to change the team's name back to the Redskins. *Id.* at ¶¶ 72, 73. Plaintiff alleges that Harris contacted NCAI to issue the press release. *Id.* at ¶ 78. Less than a month later, Plaintiff filed this lawsuit asserting purported claims for defamation, civil conspiracy, and conspiracy to violate civil rights.

## **LEGAL STANDARDS**

### **A.  Standard on a Motion to Dismiss a Claim Under Fed. R. Civ. P. 12 (b)(2).**

When challenged with a motion to dismiss under Fed. R. Civ. P. 12 (b)(2), the plaintiff has the burden to prove that the court has personal jurisdiction over the defendant. *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072 (8th Cir. 2004); *see also DakColl, Inc. v. Grand Central Graphics, Inc.*, 352 F.Supp.2d 990, 993 (D.N.D. 2005) (citations omitted) ("The party seeking to

establish the court's in personam jurisdiction carries the burden of proof, and the burden does not shift to the party challenging jurisdiction."). To survive a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), "a plaintiff must make a prima facie showing that personal jurisdiction exists." *Nuevos Destinos, LLC v. Peck,* No. 3:19-CV-00045, 2019 WL 6481441, at *7 (D.N.D. Dec. 2, 2019), *affirmed*, 999 F.3d 641 (8th Cir. 2021) (citation omitted). A prima facie showing is established "not by the pleadings alone, but by the affidavits and exhibits presented with the motions and opposition thereto." *Peck*, 2019 WL 6481441, at *7 (citation omitted); *Dever*, 380 F.3d at 1072. When a moving party challenges whether personal jurisdiction exists, the plaintiff's burden of proof does not shift to the moving party. *Peck*, 2019 WL 6481441, at *7 (citations omitted).

### B.      Standard on a Motion to Dismiss a Claim Under Fed. R. Civ. P 12 (b)(6).

#### 1.      To Defeat a Rule 12(b)(6) Motion a Plaintiff Must Plead a Plausible Claim.

To survive a Rule 12(b)(6) motion, "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) (citation omitted), and the complaint must have enough "facts to state a claim to relief that is plausible on its face." *Edwards v. City of Florissant*, 58 F. 4th 372, 376 (8th Cir. 2023), (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), (citing *Twombly*, 550 U.S. at 570)). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient. *Iqbal*, 556 U.S. at 678. "The determination of whether a complaint states a claim upon which relief can be granted is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Kraft v. Essential Health, Innovis Health, LLC*, 600 F Supp. 3d9 65, (D.N.D. 2021) (citations omitted). A plaintiff must allege facts sufficient to "nudge [his or her] claims across the line from conceivable to

plausible." *Twombly*, 550 U.S. at 570. The plausibility test helps keep defendants from wasting time and money in discovery on "largely groundless" claims. *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 56 (1st Cir. 2012) (citation omitted). "Plausible" is "something more than merely possible." *Id.* at 55. Accordingly, a complaint that fails to sufficiently state a plausible claim upon which relief can be granted must be dismissed under Rule 12(b)(6).

### 2. Rule 12(b)(6) Motions Play an Especially Important Role in Early Elimination of Unmeritorious Defamation Suits.

The "nature of a libel action lends itself to judicial scrutiny in the early stages of a defamation lawsuit." *Mitchell v. Random House, Inc.*, 703 F. Supp. 1250, 1258 n.10 (S.D. Miss. 1988), *aff'd*, 865 F.2d 664 (5th Cir. 1989). Because a defamation suit "may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself," courts should, where possible, resolve defamation actions at the pleading stage. *Washington Post Co. v. Keogh*, 365 F. 2d 965, 968 (D.C. Cir. 1966). Motions to dismiss play an "especially important role" in defamation claims. *Vindman v. Trump*, No. CV 22-257 (JEB), 2022 WL 16758575, at *4 (D.D.C. Nov. 8, 2022). Early evaluation of defamation cases "makes particular sense when examining public figure defamation suits" because "there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation." *Michel v. NYP Holdings, Inc.*, 816 F. 3d 686, 702 (11th Cir. 2016). "[T]he Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits." *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) and *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)). Courts considering a motion to dismiss a defamation claim will "routinely" address "issues such as whether the statement at bar is capable of a defamatory meaning, [and] whether it is protected opinion," *Mitchell*, 703 F. Supp. at 1258 n.10 (citation omitted), and dismiss claims "with relative frequency." *Id.*

## ARGUMENT

**I. PLAINTIFF'S COMPLAINT MUST BE DISMISSED BECAUSE THIS COURT LACKS PERSONAL JURISDICTION OVER THE COMMANDERS DEFENDANTS**

The Court lacks personal jurisdiction over the Commanders Defendants under Fed. R. Civ. P. 12(b)(2). Plaintiff asserts diversity jurisdiction under 28 U.S.C. § 1332(a)(1). Dkt. 1 ¶ 6. Plaintiff has the burden of proving the facts to support personal jurisdiction over the Commanders Defendants. *Dever*, 380 F.3d at 1072. A federal court in a diversity action may assume jurisdiction over a nonresident defendant only to the extent permitted by the long-arm statute of the forum state and within the bounds of the Due Process Clause. *Id.* at 1073 (citations omitted). A two-step inquiry is required. First, the party must be amenable to service of process under the appropriate long-arm statute and second, the party challenging personal jurisdiction must have minimum contacts with the forum state. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

> On the first part of the test, the North Dakota long-arm statute applies and provides, in part:
>
> [a] court of this state may exercise personal jurisdiction over a person who acts directly or by an agent as to any claim for relief arising from the person's having such contact with this state that the exercise of personal jurisdiction over the person does not offend against traditional notions of justice or fair play or the due process of law . . . .

N.D. R. Civ. P. 4(b)(2). The statute provides that claims arising from transacting business in North Dakota or committing a tort within or outside the state causing injury to a person or property within the state supports the exercise of personal jurisdiction. N.D. R. Civ. P. 4(b)(2)(A), (C).

A federal court exercises personal jurisdiction to the same extent as a court of general jurisdiction in the state where the federal district court is located. Fed. R. Civ. P. 4(k)(1)(A). The North Dakota Supreme Court holds that Rule 4(b)(2) "authorizes North Dakota courts to exercise jurisdiction over nonresident defendants to the fullest extent permitted by due process." *Hansen v. Scott*, 645 N.W.2d 223, 230 (N.D. 2002). Therefore, the only question for this Court is whether under the second part of the *Int'l Shoe* test, the Commanders Defendants have sufficient

"minimum contacts" with North Dakota such that an exercise of personal jurisdiction comports with due process. *Johnson v. Woodcock*, 444 F.3d 953, 955 (8th Cir. 2006).

"Due process requires 'minimum contacts' between the nonresident defendant and the forum state such that 'maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Dever,* 380 F.3d at 1073 (quoting *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291-92(1980)). These minimum contacts "must exist either at the time the cause of action arose, the time the suit was filed, or within a reasonable period of time immediately prior to the filing of the lawsuit." *Johnson*, 444 F.3d at 955 (citation omitted). A defendant must "purposefully avail" themselves of the benefits and protections of the forum state, such that the defendant has "fair warning that his activities might result in his being haled into court in that jurisdiction." *Id.* The defendant's actions must create a substantial connection with the forum state. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985)*.*

There are two types of personal jurisdiction establishing the requisite minimum contacts: general jurisdiction and specific jurisdiction. A court can establish general jurisdiction over a nonresident defendant who has "continuous and systematic" contact with the forum state regardless of whether the defendant's activities at issue in the lawsuit were directed at the forum state. *Dever,* 380 F.3d at 1073 (citation omitted). A court can establish specific jurisdiction if the activities at issue in the particular lawsuit occurred within or had some connection with the forum state. *Id.* "When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 264 (2017) (citation omitted). NAGA cannot establish that a North Dakota court has either general or specific jurisdiction over the Commanders Defendants.

**A. The Court Lacks General Jurisdiction Over the Commanders Defendants.**

A court can establish general jurisdiction over a nonresident defendant who has

"continuous and systematic" contact with the forum state regardless of whether the defendant's activities at issue in the lawsuit were directed at the forum state. *Johnson v. Arden*, 614 F.3d 785, 794 (8th Cir. 2010) (quoting *Dever,* 380 F.3d at 1073 (citation omitted)). Here, Plaintiff cannot establish that either the Club or Harris have continuous and systematic contacts with North Dakota.

### 1. The Club Does Not Have Continuous and Systematic Contacts with North Dakota.

Plaintiff's assertion that "the Commanders play in football games in stadiums spanning the entire country," Dkt. 1 ¶ 2, is meaningless and unavailing. Putting aside that the Commanders do not play *any* games in North Dakota, Declaration of Martin Mayhew ("Mayhew Decl."), at ¶¶ 8, 9, courts routinely hold that such contacts are legally insufficient to establish personal jurisdiction over non-resident professional sports teams. For example, in *Payne v. Office of the Commissioner of Baseball*, the court declined to find general personal jurisdiction in California as to all non-resident Clubs because "merely playing games in the state against California-based teams . . . [is] not sufficient to subject the Out-of-State Clubs to general personal jurisdiction within California." No. 15-cv-03229-YGR, 2016 WL 1394369, at *5 (N.D. Cal. Apr. 8, 2016); *see also Senne v. Kansas City Royals Baseball Corp.*, 105 F. Supp. 3d 981, 1018-21 (N.D. Cal. 2015) (finding no general personal jurisdiction over certain Out-of-State Clubs despite their regular travel to California for games and scouting). Similarly, in *Manton v. California Sports, Inc.*, a Georgia court declined to exercise general personal jurisdiction over the National Basketball Association team the Los Angeles Lakers even though the team played 1-2 games per year in Georgia. 493 F. Supp. 496, 496-98 (N.D. Ga. 1980). The court reasoned: "[t]o hold otherwise would subject professional sports to actions in any state where they participate, no matter how infrequently, based on an alleged tort committed elsewhere." *Manton*, 493 F. Supp. at 498; *see also Sullivan v. Tagliabue*, 785 F. Supp. 1076, 1081 (D.R.I. 1992) (holding team's contacts, including "occasional trips" to

Rhode Island, were insufficient to support jurisdiction).

Even if Plaintiff were accurate in its assertion that the Club "recruit[s] players from every state," Dkt. 1 ¶ 2 and n. 2, its position is similarly unavailing.[6] Courts have held as recently as this year that a team's recruitment efforts in a particular state are wholly insufficient to establish personal jurisdiction. *See, e.g.*, *Concepcion v. Off. of Comm'r of Baseball*, No. 22-cv-1017 (MAJ/BJM), 2023 WL 4110155, at *4  (D.P.R. May 31, 2023), *report and recommendation adopted,* No. 22-cv-1017 (MAJ/BJM), 2023 WL 4109788 (D.P.R. June 21, 2023) (finding no general jurisdiction over 30 non-resident baseball clubs based on allegations that clubs either employ or send scouts to recruit players in Puerto Rico); *see also Senne*, 105 F. Supp. 3d at 1018-19 (finding no general personal jurisdiction over nonresident baseball club despite club's travel to California for scouting and existence of certain employees based in the state). Although the Club scouts players in nearly every state, the scouting records for the last three years demonstrate that less than 1% of trips are to North Dakota. Mayhew Decl. at ¶¶ 11, 12. Likewise, the Club does not practice or play football games in North Dakota and no records show it ever has. *Id.* at ¶¶ 7-9.

Moreover, there is no other basis for which Plaintiff can establish that the Club has continuous and systematic contact with North Dakota. Based on available records, the Club has never had offices, employees, or bank accounts in North Dakota, nor does it own, lease, or rent property in North Dakota, before or after the Club acquired the NFL franchise on July 31, 2023. Bulman Decl. at ¶¶ 16-19. The Club was never licensed to do business in North Dakota, has not regularly transacted business there, has never filed tax returns or paid taxes in North Dakota, and

---

[6] Plaintiff's reliance on the claim that Carson Wentz played for the Club—more than seven years after he played college football in North Dakota, Mayhew Decl. at ¶ 16,—to imply some contact with North Dakota smacks of desperation. The Club acquired Wentz in a trade with the Indianapolis Colts seven years after he graduated from North Dakota State. *Id.* at ¶¶ 15, 16. Moreover, less than 1% of players on the Club's roster during the past three seasons graduated from a North Dakota college. *Id.* at ¶ 17.

does not have a registered agent for service of process in North Dakota. *Id*. at ¶¶ 21-27. Additionally, the Club does not advertise or market in North Dakota because it is prohibited by the NFL Constitution and Bylaws and an NFL Resolution from advertising beyond a specific geographical region surrounding Washington, D.C. *Id*. at ¶¶ 28-33. There is no basis to establish general jurisdiction over the Club.

### 2.   Harris Has No Contacts with North Dakota.

Harris is unconnected to North Dakota. The Complaint is devoid of any allegation of where Harris is domiciled, but, in fact, he lives in Florida with his family, votes in Florida and has no contacts with North Dakota for the Court to consider. Harris Decl. ¶¶ 3, 4, 15-21. He has never lived, resided or worked in North Dakota. *Id.* at ¶ 15. To the best of his recollection, he has never visited North Dakota. *Id*. Based on the available records, he has not filed tax returns or paid taxes in North Dakota within the last five years. *Id.* at ¶ 20. He has never conducted or solicited business in North Dakota, nor has he ever owned, used or possessed any bank accounts or property in North Dakota. *Id.* at ¶¶ 16, 17. Likewise, Harris has never maintained a place of business, mailing address, bank account or telephone listing in North Dakota. *Id.* at ¶ 18. Harris has never employed anyone in North Dakota nor (to his knowledge) contracted with anyone in North Dakota. *Id.* at ¶ 19. Simply put, he has never held any legal status or capacity in North Dakota. *Id.* at ¶ 21. Plaintiff cannot demonstrate that Harris has any continuous or systematic ties to North Dakota and, as with the Club, an exercise of general jurisdiction over Harris would be inappropriate.

### B.   The Court Lacks Specific Jurisdiction Over the Commanders Defendants.

Plaintiff cannot even come close to carrying its burden to establish that either of the Commanders Defendants have a "substantial connection" to North Dakota. *Johnson*, 444 F.3d at 956 (the burden is on the nonmoving party to establish a "substantial connection" between the defendant and the forum state). The Eighth Circuit has established a five-factor test for assessing

whether a court has specific jurisdiction over a defendant:

> We consider five factors in determining whether a substantial connection exists: (1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts with the forum state; (3) the relation of the cause of action to those contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties. *Id*. at 1076. The last two factors carry less weight and are not dispositive.

*Id.* at 956 (citation omitted). It is well-established that the first three factors are of "primary importance," and the last two are "secondary factors." *Stanton v. St. Jude Med., Inc.*, 340 F.3d 690, 694 (8th Cir. 2003). As an initial matter, Plaintiff has not alleged that any action by the Commanders Defendants occurred in this District[7], nor that it has suffered any harm in this District. *See* Dkt. 1 ¶ 95. Here, each factor weighs against establishing specific jurisdiction over either of the Commanders Defendants.

### 1. The Nature and Quality of the Commanders Defendants' Contacts with North Dakota are Insufficient to Establish Specific Jurisdiction.

The Commanders Defendants' alleged conduct is devoid of any connection to North Dakota such that they had "fair warning" that they would be haled into a North Dakota court. *Zidon v. Pickrell,* 344 F. Supp. 2d 624, 628 (D.N.D. 2004) ("[u]nder this factor, the primary issue is whether the non-resident defendants have fair warning that a particular activity may subject a person to the jurisdiction of a foreign sovereignty." (citing *Gould v. P.T. Krakatau Steel,* 957 F.2d 573, 576 (8th Cir. 1992))) (internal quotation marks omitted). Indeed, the Complaint fails to allege any meaningful facts that could plausibly support specific jurisdiction over either of the Commanders Defendants, and with good reason. There are none. As such, the analysis of the first prong weighs in favor of declining to exercise personal jurisdiction over the Commanders Defendants.

---

[7] NAGA alleged Laux's "defamatory statement was published electronically and directed at an organization headquartered in North Dakota." Dkt. 1 ¶ 7. However, putting aside the insufficiency of that allegation, NAGA has not adequately pled that it is headquartered in North Dakota. Dkt. 23 ¶¶ 4, 5, Dkt. 23-2.

a. **The Club's Nearly Non-Existent Contacts with North Dakota are Insufficient to Establish Specific Jurisdiction.**

Here, the Complaint vaguely asserts in conclusory language that "the Commanders tried to silence NAGA internally," that Laux is a representative of the Commanders[8], and that Commanders President Jason Wright stated the Club "will not revisit changing the team's name back to the Redskins." Dkt. 1 ¶¶ 46, 61, 73. Likewise, the Complaint asserts with no specific basis that the Club continues to call NAGA a fake organization to ticket holders. *Id.* at ¶ 81. Notwithstanding the unsupported, undetailed, wholly conclusory, and dubious merit of its claims, Plaintiff fails to tie any of the Club's purported conduct to North Dakota—nor can it—because the alleged conduct is wholly unrelated to North Dakota.

Even though the Complaint fails to allege that there are ticket holders in North Dakota, the Club has had very few ticket transactions with individuals with North Dakota addresses. In 2022 and 2023, only 0.010% of all season ticket holders had a North Dakota address. Declaration of Matthew Carabajal ("Carabajal Decl.") at ¶ 6. During the same time, only 0.012% of single game ticket purchasers had a North Dakota address. *Id.* at ¶ 7. Such few contacts are entirely insufficient. NAGA alleges no meaningful conduct that would cause the Club to be haled into a North Dakota court, nor could it. The team lacks any minimal contacts with North Dakota.

b. **Harris's Lack of Any Contacts with North Dakota Forecloses Any Argument of Specific Jurisdiction.**

Plaintiff alleges that Harris owned and operated the Commanders. *See* Dkt. 1 ¶ 3. However, Harris is not an individual owner of the Club. Rather, he invests in a series of entities that own the Club. Harris Decl. at ¶ 8. He does not exercise substantial control over the day-to-day operations

---

[8] Laux has no material contacts with North Dakota, and none that in any way could be attributed to the Commanders Defendants. Declaration of Matthew Laux in Support of Laux's Motion to Dismiss, Dkt. __ (filed on December 28, 2023) ("Laux Decl.") at ¶¶ 2-7. Moreover, there is no allegation in the Complaint that any purported defamatory conduct occurred in North Dakota.

of the Club and does not employ anyone who works for the Club. *Id.* at ¶¶ 8, 9. As such, there is no basis for the Club's contacts, insufficient as they are, to be imputed onto Harris. NAGA has vaguely claimed that Harris single-handedly "closed the door" on any public debate and the Commanders Defendants collectively "tried to silence NAGA's viewpoint." Dkt. 1 ¶¶ 39, 60. Such vague and conclusory allegations are insufficient to establish specific jurisdiction in North Dakota.

### 2. The Quantity of the Commanders Defendants' Contacts Cannot Establish Specific Jurisdiction.

There is no allegation in the Complaint that any of the conduct by the Commanders Defendants occurred in or was directed at North Dakota. The lack of allegations should be enough for this Court to decline to extend jurisdiction. *See* N.D. R. Civ. P. 4(b)(2) ("[a] court of this state may exercise personal jurisdiction over a person who acts directly . . . as to any claim for relief arising from the person's having such contact with this state).

The Club's contacts with North Dakota are *de minimus* and wholly unrelated to the present lawsuit. As discussed in Section B.1.a supra, the quantity of ticket transactions and scouting trips is negligible. Here, such a minimum quantity of contacts involving conduct outside the scope of this lawsuit fails to support an exercise of specific jurisdiction. As discussed in Sections A.2 and B.1.b supra, to the best of his knowledge, Harris has no contacts with North Dakota. As such, the analysis of the second prong weighs decisively in favor of declining to exercise specific jurisdiction over either of the Commanders Defendants.

### 3. Any of the Commanders Defendants' Contacts with North Dakota are Unrelated to This Lawsuit.

The Commanders Defendants' conduct, as alleged by Plaintiff, fails to put them on notice that they will be haled into a North Dakota court. "The proper focus of the 'minimum contacts' inquiry in intentional-tort cases is 'the relationship among the defendant, the forum, and the litigation.'" *Walden v. Fiore*, 571 U.S. 277, 289-291 (2014) (quoting *Calder v. Jones*, 465 U.S.

783, 788 (1984)) (reversing Court of Appeals because it "impermissibly allow[ed] a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis.") In *Walden*, the Supreme Court rejected that petitioner's filing of a false police report in Georgia against a Nevada resident, would permit a Nevada court to exercise jurisdiction over him. The court stated "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects [the defendant] to the forum in a meaningful way." *Id.* at 290. This Court must consider whether NAGA's "claims 'arise out of or relate to the defendant's contacts.'" *Kaliannan v. Hoong Liang*, 2 F.4th 727, 733 (8th Cir. 2021) (quoting *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021)); *see Bros. & Sisters in Christ, LLC v. Zazzle, Inc.*, 42 F.4th 948, 952 (8th Cir. 2022) ("[I]n assessing specific jurisdiction, we look only to [Defendant's] contacts with Missouri related to [Plaintiff's] claims.").

As stated in Section B.1.a supra, NAGA has failed to credibly allege that any of the Club's conduct in this lawsuit occurred in North Dakota. Although the Club has conducted minimal scouting trips to North Dakota, Mayhew Decl. at ¶¶ 11, 12, and has engaged in *de minimus* ticket sales, Carabajal Decl. at ¶¶ 6, 7, this lawsuit did not arise out of such conduct and, thus, does not permit specific jurisdiction to apply. *See Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 264 (2017) ("When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State."). As stated in Section B.1.b supra, none of Harris's conduct occurred in North Dakota. Because none of the Commanders Defendants' conduct relates to any contacts with North Dakota, the analysis of the third prong weighs in favor of declining to exercise personal jurisdiction over the Commanders Defendants.

### 4.   North Dakota Has No Interest in This Matter.

North Dakota has no interest in providing a judicial forum to its residents for this matter. Although a state has an interest in providing a forum for its resident corporations, *K-V Pharm. Co.*

*v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 595 (8th Cir. 2011), NAGA portrays itself as a corporate citizen of Virginia. Dkt. 23 ¶¶ 4, 5, Dkt. 23-3. Moreover, the Complaint fails to allege where the purported tort was committed.[9] The Complaint solely alleges that purported defamatory statement was directed toward a North Dakota entity, Dkt. 1 ¶ 1, but in no way connects the Commanders Defendants' conduct to North Dakota. *See* Section B.3. supra.

Accordingly, the State of North Dakota does not have an interest in a matter where: 1) none of the named parties are from North Dakota; 2) none of the allegedly offensive conduct occurred in North Dakota; and 3) none of the allegedly offensive conduct targeted North Dakota. As such, North Dakota has no interest in this matter, which weighs in favor of declining to exercise personal jurisdiction over the Commanders Defendants.

### 5.   North Dakota is an Inconvenient Forum for the Parties.

Lastly, consideration of the convenience of the parties weighs in favor of declining to exercise personal jurisdiction over the Commanders Defendants. All relevant conduct occurred in and around the Washington D.C., Maryland, or Virginia area and, as such, there is no basis for North Dakota to be a convenient forum. Accordingly, there is no basis for a North Dakota court to extend specific jurisdiction over either of the Commanders Defendants.

### C.  Application of the Calder Effects Test Further Demonstrates This Court Lacks Personal Jurisdiction Over the Commanders Defendants.

When an intentional tort is alleged, the court must also consider additional factors under the *Calder* Effects Test when deciding whether to exercise personal jurisdiction. *Johnson v. Arden,* 614 F.3d 785, 796 (8th Cir. 2010) (citation omitted). The *Calder* Effects Test allows the exercise "of personal jurisdiction over non-resident defendants whose acts 'are performed for the very purpose of having their consequences felt in the forum state.'" *Bros. & Sisters in Christ,*

---

[9] Laux has declared that he was in Maryland and, to his knowledge, King was in the DMV area, during his text exchange with her. Laux Decl. at ¶ 6.

*LLC v. Zazzle, Inc.*, 42 F.4th 948, 954 (8th Cir. 2022) (citation omitted). To establish personal jurisdiction under *Calder*, Plaintiff must show that Commanders Defendants: "acts (1) were intentional, (2) were uniquely or expressly aimed at the forum state, and (3) caused harm, the brunt of which was suffered—and which the defendant knew was likely to be suffered" in North Dakota. *Id.*

Plaintiff fails to satisfy its burden. The alleged defamatory text message was not published in North Dakota and there is no plausible allegation that any of the Defendants intended for Laux's purported actions to have an effect in North Dakota. Indeed, there is no allegation that Laux or the Commanders Defendants knew of any connection between NAGA and North Dakota, however slight it might be. *Hicklin Eng'g, Inc. v. Aidco, Inc.*, 959 F.2d 738 (8th Cir. 1992). The *Calder* court held the intentional targeting of a forum state supports personal jurisdiction and determined effects alone without additional contacts is insufficient to establish personal jurisdiction. Although some members of NAGA may reside in North Dakota, the mere fact an injury may have occurred to a forum resident is insufficient. *Zazzle, Inc.*, 42 F.4th at 954. This Court should conclude that an exercise of personal jurisdiction over the Commanders Defendants would violate traditional notions of fair play and substantial justice, and is prohibited by the Due Process Clause of the Fourteenth Amendment. The Court should dismiss NAGA's Complaint against the Commanders Defendants for lack of personal jurisdiction.

## II.  ALTERNATIVELY, THE COURT SHOULD DISMISS THE COMPLAINT WITH PREJUDICE BECAUSE PLAINTIFF FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

The Complaint purports to allege that Laux and the Commanders defamed NAGA pursuant to a single text message Laux sent to one fan, Christina King, a former suite holder and supporter of the public effort to persuade the Club to revert its name to the "Redskins" within the context of a national controversy. Dkt. 1 ¶¶ 86-87. The statement, "You understand the people that started

this petition is a fake group right?", *id*. at ¶¶ 43-47, 51,[10] is non-actionable and protected by broad First Amendment principles for any of three wholly separate and independent reasons: (1) the challenged statement is not defamatory since it does not contain a provable statement of fact; (2) it is an expression of non-actionable protected opinion; and (3) NAGA, a public figure, has failed to plausibly plead that Laux or the Commanders published the statement with actual malice.

The gravamen of NAGA's Count I is that the Commanders and Laux committed libel.[11] N.D. Cent. Code § 14-02-03 defines libel as:

> a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes the person to be shunned or avoided, or which has a tendency to injure the person in the person's occupation.

### A. The First Amendment's Broad Protections for Public Debate Restrict Defamation Claims Such As NAGA's.

The First Amendment protections against defamation claims are rooted in the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times v. Sullivan*, 376 U.S. 254, 271 (1964). "Statements that cannot reasonably be interpreted as stating actual facts about an individual are protected, thus assuring

---

[10] The Complaint does not plausibly allege how the Commanders are responsible for Laux's statement. The complaint provides no specific allegations of who, how, when, where, why and in what manner any alleged authority was delegated to Laux to make the statement on behalf of the Commanders, nor that Laux, a sales representative, was operating as an agent of the team regarding the name change, the surrounding public debate and the controversy it generated, when he texted with Ms. King. NAGA's Complaint does not satisfy Plaintiff's Rule 12(b)(6) pleading requirements against the Club. *Id*.

[11] NAGA's conclusory contention that the Commanders and Laux also committed slander in violation of N.D. Cent. § 14-02-03 fails to meet its pleading burden. "A plaintiff must plead and prove a defamation claim with a certain degree of specificity, including, pleading who made the alleged defamatory statement, to whom the statements were made, and where the statements were made". *Pope v. ESA Servs.*, 406 F. 3d 1011 (8th Cir. 2005). "[F]ederal courts favor specific pleading of defamation claims because 'knowledge of the exact language used is necessary to form responsive pleadings.'" *Bauer v. Ford Motor Credit Co.*, No. Civ. 00-389, 2000 WL 34494820, at *3 (D. Minn., June 27, 2000) (quoting *Asay v. Hallmark Cards, Inc.*, 594 F. 2d 692, 699 (8th Cir. 1979)). NAGA's broad claims that Laux defamed NAGA to "luxury box owners," Dkt. 1 p. 3, "on information and belief, the Commanders continue to call NAGA a fake . . . to ticket holders . . . they say it over the phone . . . ." *id.* ¶ 81, and "the statement also constitutes slander . . . ." *id.* at ¶ 90, fall woefully short of the required specificity and must be dismissed. Even if NAGA pled the who, what, when, where and how of a specific oral statement using the word "fake," it would still not meet its Rule 12(b)(6) burden for the same reasons its claim of libel by a single written text fails as demonstrated in this section.

that public debate will not suffer for lack of "imaginative expression" or the "rhetorical hyperbole" which has traditionally added much to the discourse of this Nation." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) (internal citation omitted). *Favre v. Sharpe*, No. 2:23-cv-42-KS-MTP, 2023 WL 7132949, at *3 (S.D. Miss., Oct. 30, 2023). (Copy attached as Ex. 1). Accordingly, "a statement must be false to be defamatory." *Schmidt v. MeritCare Health Sys.*, *Dakota Clinic, Ltd.*, 834 N.W.2d 627, 632 (N.D. 2013) (citation omitted). *See e.g. Aviation Charter, Inc., v. Aviation Rsch. Grp./US*, 416 F. 2d 864, 868 (8th Cir. 2005) ("Statements about matters of public concern that are not capable of being proven true or false and statements that reasonably cannot be interpreted as stating facts are protected from defamation actions by the First Amendment.") (citations and internal quotation marks omitted).

Consistent with these principles, the Supreme Court has long recognized that a defamation claim may not be actionable when the alleged defamatory statement is based on non-literal assertions of "fact." E.g., *Horsley v. Rivera*, 292 F.3d 695, 701 (11th Cir. 2002) (citing *Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264, 284 (1974) ("pejorative definition of scab was not actionable . . . words like 'traitor' could not be construed as representations of fact")); *Greenbelt Coop. Pub'lg Ass'n v. Bressler*, 398 U.S. 6, 13-14 (1970) (The term "blackmail" characterizing the negotiating position of a public figure who was seeking zoning variances was not "slander" when spoken in heated public city council meetings or "libel" when reported in articles, as it was impossible to believe a listener or reader would think that a crime had been charged).

Because defamation requires a false statement at its core, opinions do not give rise to liability once they are not susceptible to being proven true or false. E.g., *Secrist v. Harkin*, 874 F.2d 1244, 1248 (8th Cir. 1989) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974)). "Notably, 'statements about matters of public concern not capable of being proven true or false and

statements that cannot be interpreted reasonably as stating facts are protected from defamation actions under the First Amendment.'" *Turkish Coal of Am., Inc. v. Bruininks*, 678 F.3d 617 (8th Cir. 2012) (citations omitted). Since it cannot be proven false, "no opinion is actionable, whether it concerns a private person or a public figure." *Reeder v. Carroll*, 759 F. Supp. 2d 1064, 1080 (N.D. 2010) (quoting *Janklow v. Newsweek, Inc.,* 788 F.2d 1300, 1302 (8th Cir. 1986)). "Thus, a statement cannot be defamatory if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts." *Kaveh Afrasiabi v. UPI*, 561 F. Supp. 3d 1, 5 (D. Mass. 2021).

Additionally, under North Dakota laws "[i]t is axiomatic that opprobrious epithets, even if malicious, profane, and in public, are ordinarily not actionable. There is no right to recover for bad manners." *Meier v. Novak*, 338 N.W.2d 631, 635 (N.D. 1983) (citations omitted). The use of pejorative rhetoric, figurative language, imaginative expression, or hyperbole is non-actionable as defamation because it is understood as figurative rather than as statements of literally true facts about an individual. *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F. 3d 122, 128 (1st Cir. 1997). "[B]road, unfocused, wholly subjective comment" is also protected opinion. *Lauderback v. Am. Broad. Cos.*, 741 F.2d 193, 197 (8th Cir. 1984). "Rotten," "unethical," "sometimes illegal," "crooks" and "liars" are "broad brush-stroked references" that may be understood by a reasonable person as opinion. *Id*. at 195. Language that is "insufficiently precise and cannot be proven false" cannot support a defamation claim. *Chambers v. Travelers Cos.*, 668 F. 3d 559, 565 (8th Cir. 2012).

To distinguish "fact from opinion," a court should consider the context of the statement, *Meier v. Novak*, 338 N.W. 2d 631, 633 (1983), "in the context of the entire document, and the sense or meaning of the document must be determined by construing the words accordingly to the

natural and ordinary meaning a reasonable person of ordinary intelligence would give them."

*Schmitt v. MeritCare Health Sys., Dakota Clinic, Ltd.*, 834 N.W.2d 627, 633 (N.D. 2013) (citations

omitted.) *See, e.g., Secrist*, 874 F.2d at 1248 ("context is crucial"). "The court must examine 'the

totality of the circumstances to determine whether the ordinary reader would have interpreted the

statement as an opinion.'" *Hammer v. Osage Beach*, 318 F. 3d 832, 842-43 (8th Cir. 2003) (citation

omitted). "Whether a statement of fact can be interpreted as stating facts is a question of law" for

the Court to decide. *Turkish Coal of Am., Inc. v. Bruininks*, 678 F.2d 617, 625 (8th Cir. 2012).

Those who willingly participate in public debate "must accept a degree of derogation that others

need not." *Secrist*, 874 F.2d at 1249 (citations omitted). "They must, in effect, have 'tougher

hides.'" *See id.,* (citing *Ollmann v Evans*, 750 F.2d 970, 1005 (D.C. Cir. 1984) (J. Bork,

concurring)).

### B. The Allegation That Laux Called NAGA a "Fake Group" Is Not Actionable Because It Does Not Convey Objective Truth.

When assessed in light of these demanding standards, and in the full and fair context,

Laux's statement does not assert an actionable false statement of fact and cannot be lawfully

challenged in a defamation suit. The term "fake group" is too inherently subjective, imprecise and

loose to be a statement of objective fact and is thus not actionable. *See, e.g*., *Chambers*, 668 F. 3d

at 565 (insufficiently precise language cannot support a defamation claim).

#### 1. Laux's Statement Must be Read in the Context of His Full Text Exchanges and the National Public Controversy Over the Club's Name Which Shows It Was Not an Assertion of Fact.

When read fairly, Laux's statement was not a precise assertion of fact as underscored by

the context in which it was made. *See, e.g., Aviation Charter, Inc.*, 416 F.3d at 868 (finding the

inquiry is whether the statement is factual and susceptible of being proved true or false). The

circumstances that lead Laux to send the text demonstrate his statement was not an assertion of

fact. Following the new ownership's acquisition of the team in July 2023, Laux conversed (in

August 2023) by text with a past season-ticket holder, luxury suite holder and fan, Christina King. Dkt. 1 ¶ 47. In 2020, King had boycotted the team because of the name change. *Id.* at ¶¶ 47-48. Laux was trying "to convince Ms. King to purchase box seats." *Id.* at ¶ 52.

In the exchange, King told Laux she wanted the team's name changed back and she told him of "NAGA's petition." *Id.* at ¶¶ 48-50; Martin Decl. ¶ 5, and Ex. B ("Native Americans leading Redskins petition outraged that a Washington Commanders rep called them 'fake group'") (the "Aug. 29 Fox Article"). In a text that King sent to Laux (earlier in the day before he responded with the text at issue) she stated: "This name change WAS, IS & forever will be a major problem." *Id.* At some point during the text exchange Laux said he had not wanted the team name changed either. *Id.* King further texted to Laux during the conversation "We just signed the petition from NAGA . . . . We will come back as suite owners when the name reverts back to Washington Redskins." *Id.* There is no allegation during these text exchanges that Laux said anything remotely close to any of the pejorative connotations NAGA now seeks to ascribe to him and the Commanders.

From these multiple texts, NAGA has cherry-picked one sentence from Laux's exchange with King to challenge as offensive. Dkt. 1 ¶ 51. The challenged statement is, however, an abbreviation of Laux's actual statement, which more fully reads:

You understand the people that started this petition is a fake group right?

**Again, I was born a Redskins fan and have always been a fan of the team. I cheer for them because of the area they're located in not because they're called the Redskins."**

Martin Decl. ¶ 5, and Ex. B. (emphasis added). This fuller picture demonstrates the challenged statement was rooted in Laux's subjective views on NAGA's very public petition, NAGA's position in the controversial public name debate, and Laux's view as a longtime fan that the team earned support no matter its name, a meaning changed by NAGA's impermissible dissection of

22

his actual statement. In this context, none of these views is provable as true or false and thus cannot sustain a defamation claim. *See e.g., Laurence v. Evans*, 573 So. 2d 695, 698 (Miss. 1990) ("The said-to-be offending words must be set in the context of the entire utterance. Their complexity draws color from the whole."); *Deupree v. Iliff*, 860 F.2d 300, 303 (8th Cir. 1988) ("When [the] challenged statement is considered in this light, the statement loses much of the fact-specific quality it may appear to have when viewed in isolation").

Finally, the Complaint leaves no doubt that Laux's statement was made in the context of the national public controversy involving the often emotional and passionate debate over the Washington team's past use of "Redskins" as its name, the prior owner's discontinuance of that name, and the new owner's decision not to change the name back. NAGA was a very active participant in the debate. Dkt. 1 p. 2, ¶¶ 30-33, 35. NAGA's Complaint also acknowledges the divergent public views of NAGA and NCAI in that debate, including on multiple Native American cultural and social issues (including racial insensitivity) and particularly their different perspectives on the use of Native American imagery in professional football and sports throughout the United States. For example, "NCAI . . . [claims] . . . ["Redskins"] was offensive and disrespectful to Native American culture, *id.* at ¶ 26, while NAGA members "were proud to watch professional football players in a different kind of battle, with the stoic face of Chief White Calf on their helmets." *Id.* at 3.

In this context and examining the totality of the circumstances, *Hammer*, 318 F. 3d at 842-43,—a one-on-one text discussion, initiated by Ms. King, in the midst of the much publicized public name controversy and King's interjection of NAGA's online petition to support her reason to reject Laux's sales effort—Laux's responsive statement cannot be actionable as an objective assertion of verifiable fact. *See Ayyadurai v. Floor 64, Inc.*, 270 F. Supp. 3d 343, 358-59

(D. Mass. 2017) (finding that whether plaintiff's claim that defendant's statements charging that plaintiff had been perpetuating a "fake" story that plaintiff invented "email" are true or false "depends not only on how one defines 'email,' but also on how one defines 'fake.' Because both terms, in this context, are imprecise, the statements are not actionable."); *Penrose Hill, Ltd. v. Mabray*, 479 F. Supp. 3d 840, 846, 857-8 (N.D. Cal. 2020) (finding that the blog title "Fakers Not Makers and The Return of Phillip James" and defendant's other references to "fake" and "fakers" are unclear, do not impute any objective connotation and are "a subjective assessment of quality rather than a statement of fact and must be dismissed"); *Metcalfe v. KFOR-TV*, 828 F.Supp. 1515, 1531 (W.D. Okla. 1992) (whether something is a "'sham' . . . is an evaluative characterization, 'not susceptible to proof of its truth or falsity.'"). The term "fake group," in this context, is a broad, unfocused, loose characterization, indefinite, imprecise and wholly subjective comment "incapable of proof and, thus, non-actionable." *See Lauderback*, 741 F.2d at 196; *Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724, 728 (1st Cir. 1992) (use of terms such as "fake," "phony," and "a rip-off, a fraud, a scandal, a snake oil job" do not state facts). "Not only is this commentary figurative and hyperbolic, but we also can imagine no objective evidence to disprove it." *Phantom Touring, Inc.,* 953 F.2d at 728. *See Chambers*, 668 F.3d at 564-65. Accordingly, NAGA's defamation claim must be dismissed.

### 2. Because the Challenged Statement Is Susceptible to Multiple Meanings, It Is Also Too Loose and Imprecise to Be an Assertion of Fact and Therefore NAGA's Defamation Claim Must Be Dismissed.

Courts also uniformly reject defamation claims based on the use of "fake," and similar words, because whether something is "fake" or "phony" is loose and imprecise language and, thus, "unprovable, since those adjectives admit of numerous interpretations." *Phantom Touring, Inc.,* 953 F.2d at 728, ("The lack of precision [in the meaning of the word 'scam'] makes the assertion 'X is a scam' incapable of being proven true or false." (quoting *McCabe v. Rattiner*, 814 F.2d 839,

842 (1st Cir. 1987))). "Statements which are 'loosely definable' or 'variously interpretable' cannot in most contexts support an action for defamation." *Secrist*, 874 F.2d at 1250, (citing *Ollman*, 750 F.2d at 980); *see also Campbell v. Citizens for Honest Gov't*, 255 F.3d 560, 567 (8th Cir. 2001) (where a word or term challenged in a defamation suit is susceptible to multiple interpretations, they are too vague to support a claim). Moreover, "[a] plaintiff cannot 'choose what meanings to attach to statements where several are available.'" *Campbell*, 255 F.3d at 567.

Here, "fake group" is so loose and undefinable a term that there are multiple interpretations of its meaning, which negates its use as an assertion of provable fact in a defamation suit. NAGA groundlessly asserts that "[r]eading between the lines Laux was attacking the very identity of NAGA's members . . . calling them 'fake' Native Americans," Dkt. 1 p. 4, "Laux's statement could be reasonably interpreted to call NAGA and its members 'con artists,'" *id*. at ¶ 89, "it imputes NAGA to be committing a crime . . . by falsely soliciting contributions under the guise that they would be tax deductible," *id*. at ¶ 91, and "NAGA is committing fraud." *Id*. Such various interpretations demonstrates that Laux's "fake group" statement is not an assertion of objective fact.[12] For example, NAGA's claim that Laux's statement can fairly be read to accuse NAGA of tax fraud is unreasonable, if not preposterous: Any fair reading of the statement, in context, cannot arrive at that conclusion. *See, e.g.*, *Phantom Touring, Inc.*, 953 F.2d at 278 ("Fraud" is generally protected as hyperbolic speech). Similarly, on its face, and in context, the challenged statement makes no assertions about the legitimacy or genuine status of NAGA or its members as Native Americans. NAGA cannot assign its own meaning to terms and then cry foul. *Campbell*, 255 F.3d

---

[12] Contrary to the inflammatory and exaggerated accusations in the Complaint, no fair reading of Laux's statement could connote that he was claiming NAGA members were not genuine Native Americans, that NAGA was not an authentically organized legal charitable entity, that he accused NAGA of criminal conduct or that his statement was steeped in racism. Nevertheless, the statement even with the multiple connotations that NAGA attempts to advance cannot form the basis of a defamation claim.

at 567. Further, in context, NAGA's claim that Laux's statement could mean he was accusing it of not being a properly and lawfully organized entity is nonsensical in a discussion about ticket sales, football team names, petitions, fan loyalty and differing views on reasons to support a team despite its name. Nevertheless, that NAGA claims the same challenged statement can have the multiple meanings it alleges, demonstrates that Laux's statement cannot, as a matter of law, form the foundation of a defamation claim.[13] *See e.g., Campbell*, 255 F.3d at 567.

In context, the term also can be read reasonably as Laux's subjective view of NAGA's Petition, its position in support of changing the team's name back to "Redskins," and its reasoning on the multiple issues covered in the Petition. *See* Martin Decl. ¶ 4, and Ex. A. Thus, the term "fake group" has multiple interpretations, which renders it, as a matter of law, incapable of being a factual assertion. *See e.g., Campbell,* 255 F.3d at 567. Accordingly, NAGA has not, and cannot, meet its exacting pleading burden and its claim must be dismissed for this separate reason as well.

### 3. The Allegation That Laux Called NAGA a Fake Group Is Also Non-Actionable Opinion and Therefore Its Defamation Claim Must Be Dismissed.

"Expressions of opinion . . . are generally not actionable if, in context, the audience would understand the statement is not a representation of fact." *East Coast Test Prep LLC v. Allnurses.com, Inc.*, 307 F.Supp.3d 644, 674 (D. Minn. 2017) (citation omitted). A hyperbolic remark made in such a manner that it could not be reasonably understood as a factual assertion makes it plain that the speaker is expressing a subjective view or interpretation instead of an actionable defamatory statement. *Condron v. McKennan*, No. 4:21-CV-04135-RAL, 2023

---

[13] Even if they were reasonable, which they are not, NAGA's other ascribed meanings are equally unavailing to support a defamation claim for the same reasons. *See, e.g., Mattel, Inc. v. MCA Recs., Inc.*, 296 F.3d 894, 908 (9th Cir. 2002) ("Crime" is non-actionable "rhetorical hyperbole"); *Yauncy v. Hamilton*, 786 S.W.2d 854 (Ky. 1989) (statement that someone was a "con artist" was protected opinion); *Farber v. Jeffreys*, 941 N.Y.S.2d 537 (N.Y. Sup. Ct. 2011) (finding that email statement that journalist was a "liar" and "fraud" were non-actionable in context of a heated public debate), *aff'd* 959 N.Y.S.2d 486, 488 (App. Dist. 2013).

WL 6388014, at *12 (D.S.D. Sep. 29, 2023).

Several courts have considered the term "fake" and found it to be nothing more than protected opinion in the form of pejorative, hyperbolic, imaginative, rhetorical, figurative, and evaluative characterizations, other protected colorful, robust, or explicit speech, and other forms of protected opinion. *See, e.g., Phantom Touring, Inc.*, 953 F.2d at 728 ("fake" and "phony" are opinion); *see also, Gray v. St. Martin Press. Inc.*, 221 F.3d 243, 248 (1st Cir. 2000) (statements that plaintiff's "closeness to the President [Reagan] and other [] [officials] was often faked" were protected opinion); *Stoltz v. Cty of Lancaster*, No. 08-CV-5622, 2011 WL 815709, at *16-17 (E.D. Penn., March 7, 2011) (allegations that "defendants made false accusations that [plaintiff] was 'faking her injury' [and] questioned the validity of her disability [were] not defamatory" and "[were] an opinion"); *Krinsky v. Doe 6*, 159 Cal. App. 4th 1154, 1176-77 (Cal. Ct. App. 2008) (in the context of an online message board containing "vulgar and insulting" language, a statement that plaintiff had a 'fake' medical degree was obviously intended as ridicule rather than a statement of fact); *see also, Polish Am. Immigr. Relief Comm., Inc. v. Relax,* 189 A.D.2d 370, 373-74 (N.Y. App. Div. 1993) (finding that statements in a magazine describing Polish immigrant aid corporation as "false do-gooders" were protected opinion because the statements were rhetorical hyperbole in the context of the publication); *Lauderback v. Am. Broad. Cos.*, 741 F.2d 193, 196 (8th Cir. 1984) (finding that "liar" is a non-actionable opinion); *McIntosh v. Capital Cities/ABC, Inc.*, N.Y.L.J., IA Part 8 p. 2 (Sup. Ct. Kings Cty., Nov. 9, 1995) (when read in context, use of the term "phony" is not defamatory, but rather, non-actionable "heated invective.") (copy attached as Ex. 2); *Ernst v. Bassett*, 521 So. 2d 414, 420 (5th Cir. 1988) (finding that "charlatan" not defamatory, but an expression of opinion); *Metcalf v. KFOR-TV*, 828 F. Supp. 1515, 1530 (W.D. Okla 1992) ("Whether or not something is a 'sham'" is a matter of opinion); *Dilworth v. Dudley*,

75 F.3d 307, 310 (7th Cir. 1996) (words like "fake" and "phony," the word "crank" is a "colorful and insulting way of expressing disagreement . . . and it therefore belongs to the language of controversy rather than to the language of defamation.").

Because Laux's statement is constitutionally protected rhetorical hyperbole using loose figurative language, it is also protected opinion, and cannot support a defamation claim as a matter of law. Count I must be dismissed for this separate reason as well.

### C. NAGA Has Failed to Plausibly Allege That Laux or the Commanders Published His Statement With Actual Malice and Therefore Its Defamation Claim Must Be Dismissed.

"[A] public figure is prohibited from recovering damages for defamation … unless there is clear and convincing evidence the defamatory statement was made with actual malice." *Riemers v. Mahar,* 748 N.W.2d 714, 720-21 (N.D. 2008) (citations omitted). Whether someone is a private or a public figure is a question of law governed by federal constitutional law. *Id*. at 721 (citing *Lundell Mfg. Co. v. Am. Broad. Cos., Inc.*, 98 F.3d 351, 362 (8th Cir. 1996)). "Public figures include non-public persons who are 'intimately involved in the resolution of important public questions…'" *Id*. (quoting *Gertz v. Robert Welch, Inc.*; 418 U.S. 323, 337 (1974) (citations omitted)). Some public figures have "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Id*. (quoting *Gertz*, 418 U.S. at 345). Public figures "invite attention and comment" and "[b]ecause they inject themselves in public controversies . . . have voluntarily exposed themselves to increased risk of injury [for] defamatory [statements]." *Id*. To determine an individual's public figure status a court looks "at the nature and extent of the individual's participation in the controversy giving rise to the alleged defamation." *Id*.

Here, NAGA is, at a minimum, a limited public figure because it is an incorporated non-profit federal tax-exempt entity with the "organizational mission . . . to further cultural and ethnic

awareness." Dkt. 1 ¶ 1. It voluntarily injected itself into the ongoing public controversy over the Washington football team by "championing [the] online petition," which was first publicly posted on Change.org in June 2023. *Id*. p. 2, ¶¶ 30, 35; Martin Decl. ¶ 4 and Ex. A. NAGA's allegations that its "petition [received] over 132,000 signatures," Dkt. 1 p. 4, "went viral," *id*. at ¶ 31, and was supported with favorable polling data from Native Americans, *id*. at ¶ 33, further demonstrates NAGA's voluntary interjection into, and influence on, the public name change controversy. Indeed, NAGA trumpets that "NAGA opened the topic for public discourse." *Id*. at ¶¶ 37, 38. Therefore, because it "voluntarily assumed a role of special prominence in the controversy and sought to influence its outcome," NAGA is, at a minimum, a limited purpose public figure subject to the First Amendment heightened pleading burden to plausibly plead actual malice by clear and conclusory evidence. *Reimers*, 748 N.W.2d at 721; *Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.,* 951 F.3d 952, 958 (8th Cir. 2020) (internal quotation marks omitted) (corporate plaintiff was a limited purpose public figure because alleged false statements were made "in a news story that concern[ed] matters of legitimate public interest" about corporate plaintiff's conduct).

Because NAGA is a limited purpose public figure, it must plausibly plead actual malice. *See* Legal Standards, *supra* at pp. 4-6. Pleading actual malice is an onerous task. "[T]o make out a plausible [actual] malice claim, a plaintiff must still lay out enough facts from which [actual] malice might reasonably be inferred." *Nelson Auto Ctr., Inc.*, 951 F.3d at 958 (citation and internal quotation marks omitted). "Every circuit that has considered the matter has applied the *Iqbal/Twombly* standard and held that a defamation suit may be dismissed for failure to state a claim where the plaintiff has not pled facts sufficient to give rise to a reasonable inference of actual malice." *Id.* (citations omitted).

"Actual malice is knowledge that the statements are false or that the statements were made

with reckless disregard for whether they were false." *Riemers*, 748 N.W.2d at 722 (citation omitted). "The plaintiff must demonstrate the author had serious doubts about the truth of his publication or had 'a high degree of awareness of [the] probable falsity.'" *Id*. (citation omitted); *Campbell*, 255 F.2d at 569. "The question whether the … record in a public figure defamation case is sufficient to support a finding of actual malice is a question of law," because in cases raising First Amendment issues, "the [] court has an obligation to examine the whole record and to ensure the judgment does not constitute a forbidden intrusion on free expression." *Riemers,* 748 N.W. 2d at 722, (citing *Milkovich*, 497 U.S. at 17 (citation omitted)). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Sican v. JBS S.A.*, No. 4:22-cv-00180-RGE-HCA, 2023 WL 2643851, at *3 (S.D. Iowa Mar. 23, 2023) (citations omitted); *see Grawitch v. Charter Commc'ns., Inc.*, 750 F.3d 956, 960 (8th Cir. 2014).

In the present case, NAGA fails to plead any facts that, taken as true, could establish by the requisite clear and convincing evidence that Laux and the Commanders published the alleged defamatory statement with actual malice, *i.e.*, while knowing they were false or while entertaining serious doubts about their truth. Indeed, NAGA makes no plausible allegation that the Commanders published, or authorized to be published, the statement at all. Instead, NAGA attempts to substitute wholly conclusory, and insufficient, assertions that "Laux's statement is false." Dkt. 1 ¶¶ 57, 88. Otherwise, the Complaint is devoid of any allegations, much less plausible allegations, which suffice to meet its exacting pleading burden.

While the Complaint is replete with inflammatory allegations of the Defendants' purported ill will and improper motivations, not one of those allegations, or taken as a whole, remotely plead

the requisite actual malice. *See Greenbelt Coop. Publ'g Ass'n v. Bressler*, 398 U.S. 6, 10 (1970) (publication of a defamatory statement out of "spite, hostility or deliberate intention to harm" does not constitute actual malice under the First Amendment); *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666 (1989) ("[T]he actual malice standard is not satisfied merely through showing of ill will or 'malice' in the ordinary sense of the term."); *St. Croix Printing Equip., Inc. v. Sexton*, No. 06-4273 (PAM/JSM), 2008 WL 3412090, at *5 (D. Minn. Aug. 8, 2008) (citation omitted) ("Reckless disregard requires proof that the defendant made the statement while subjectively believing that the statement was probably false"). In sum, NAGA failed to allege any facts which, if proven, plausibly establish that Laux and the Commanders knowingly published false and defamatory statements about NAGA. That failure constitutes an independently sufficient basis for dismissal of Count I with prejudice. *See supra*, pp. 4-6.

### D.  The Complaint Fails to State a Claim for Civil Conspiracy and Therefore NAGA's Claim Must Be Dismissed.

Plaintiff's second claim, for civil conspiracy (Count II, against Defendants Harris, the Commanders and NCAI, (the "Count II Defendants")) is likewise without merit. Under North Dakota law, "a civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another and an overt act that results in damages." *Wilkinson v. Bd. of Univ. & Sch. Lands*, 981 N.W.2d 853, 862, (N.D. 2022) *cert. denied sub nom. Wilkinson v. Bd. of Univ. & Sch. Lands of N. Dakota*, 143 S. Ct. 1752, 215 L. Ed. 2d 651 (N.D. 2023) (citation omitted). In support of its claim, Plaintiff only alleges that the Count II Defendants' press releases "concealed Laux's defamatory statement" and that, because the Count II Defendants "pretend[ed] that [the statement] never happened," they therefore "hopp[ed] on board the defamation train." Dkt. 1 ¶ 100.

Plaintiff's civil conspiracy claim fails for four independent reasons: (1) Plaintiff does not allege any agreement to commit an underlying wrong; (2) Plaintiff does not adequately allege that defendants acted "in concert" with each other; (3) Plaintiff does not allege how the press releases are overt acts in furtherance of any such agreement; and (4) Plaintiff does not allege how it was damaged by any such agreement.

### 1. The Complaint Fails to Allege Plausibly an Agreement to Commit an Underlying Wrong.

Plaintiff cannot establish a prima facie case for civil conspiracy unless it alleges an underlying wrong that is "generally [] actionable as a tort claim." *Wilkinson v. Bd. of Univ. & Sch. Lands*, 981 N.W.2d 853, 862 (N.D. 2022). Ironically, in support of its claim, Plaintiff concedes that the Count II Defendants did *not* commit an underlying wrong. To the contrary, Plaintiff alleges that the Count II Defendants "concealed" Laux's statement and "pretend[ed] that it never happened." Dkt. 1 ¶ 100. In other words, Plaintiff alleges that by ***not*** publishing an allegedly defamatory statement, the Count II Defendants conspired to defame Plaintiff. This logical fallacy cannot be the basis for a civil conspiracy claim. It similarly defies logic that the Count II Defendants "celebrating the Commanders' decision to keep the Commander name," Dkt. 1 ¶ 4-5, is actionable in tort, and Plaintiff makes no attempt to explain what tort would be implicated by such a "celebration."

Because NAGA does not allege any actionable wrong underlying the purported conspiracy, NAGA's claim for civil conspiracy cannot stand, and must be dismissed for failure to site claim upon which relief can be granted. *See Wilkinson v. Bd. of Univ. & Sch. Lands*, 981 N.W.2d 853, 862 (N.D. 2022); *Peterson v. N. Dakota Univ. Sys.*, 678 N.W.2d 163, 174 (N.D. 2004).

### 2. The Complaint Fails to Allege Plausibly an Agreement or That Defendants Acted in Concert with Each Other.

Even if Plaintiff had alleged an underlying wrong that is actionable in tort, it has

nonetheless failed to adequately allege that there was any agreement between the Count II Defendants, or that Defendants acted in concert with respect to any such agreement. All the Complaint alleges is that on August 30, 2023, Harris contacted NCAI to issue a press release, Dkt. 1 p. 4, ¶¶ 71, 100, and that "NCAI's press release shows that NCAI was working in tandem with the Commanders" because "NCAI applauds the Commanders after Laux defamed fellow Native Americans." *Id.* at ¶ 78. Even if this were true, the alleged fact of one Defendant contacting another Defendant, coupled with a bald legal conclusion of concerted action and an agreement, does not plausibly allege an agreement to do anything. *See Kelly v. City of Omaha, Neb.*, 813 F.3d 1070, 1078 (8th Cir. 2016). Therefore, Count II fails and must be dismissed.

### 3. The Complaint Fails to Allege Plausibly Any Overt Acts in Furtherance of an Unlawful Conspiracy.

The only "overt act" that the complaint alleges the Count II Defendants committed in furtherance of the alleged conspiracy is the issuance of their respective press releases. Dkt. 1 ¶¶ 101-03. However, Plaintiff fails to allege how the press releases were issued in furtherance of a conspiracy to "further defame" Plaintiff. Indeed, Plaintiff does not allege that the press releases were defamatory in any way (and, as discussed above, the complaint specifically alleges that the Count II Defendants did *not* publish the allegedly defamatory statement). *See id.* at ¶¶ 71-78, 100; Martin Decl. ¶¶ 6, 7, Ex. C ("Washington Commanders Announce Upgrades to FedExField, Fan Experience for the 2023 NFL Season"), and Ex. D ("Washington Commanders Make Roster Moves"). Because NAGA has failed to plausibly allege any overt acts taken in furtherance of a conspiracy, Count II fails for this separate reason.

### 4. The Complaint Fails to Allege Plausibly That Any Purported Conspiracy Caused Plaintiff Damages.

Even if Plaintiff had adequately alleged an underlying wrong, an agreement by the Count II Defendants, and an overt act in furtherance thereof, its claim would nonetheless fail because

Plaintiff does not allege how it was harmed by the alleged conspiracy. Plaintiff only alleges that NCAI obtained power and business opportunities from the press releases, and that the press releases concealed Laux's alleged defamatory statement. Dkt. 1 ¶¶ 78-79. There is no factual allegation that the press releases had *any* effect on NAGA, let alone a harmful one.

In its preliminary statement, the Complaint suggests implausibly, and in conclusory fashion, that Defendants' conduct has "silenced over ninety percent of Native Americans who disagree with them" and "[t]hey also silenced Americans." Dkt. 1 p. 5. Putting aside the fact that the Complaint does not contain a single factual allegation supports these assertions, Plaintiff seeks $1 million in damages, yet does not explain how that purported harm to "Native Americans" and "Americans" generally relate in any way to Plaintiff. Therefore, Count II fails and must be dismissed.

### E.  The Complaint Fails to State a Claim for Violation of 42 U.S.C. § 1985(3) and Therefore It Must Be Dismissed.

NAGA's complaint falls woefully short of stating a claim for conspiracy to interfere with civil rights (Count III against Harris, Commanders and NCAI (the "Count III Defendants")) and must be dismissed for failure to state a claim upon which relief can be granted. In order to prove the existence of such a conspiracy under § 1985(3), the plaintiff must prove: (1) that the defendants did actually "conspire," (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or equal privileges and immunities under the laws, (3) that one or more of the conspirators did, or caused to be done, any act in furtherance of the object of the conspiracy, and (4) that another person was injured in his person or property or deprived of having and exercising any right or privilege of a citizen of the United States. 42 U.S.C. § 1985(3).

Plaintiff's claim fails for five independent reasons: (1) the constitutional rights that Plaintiff

asserts are not protected against private interference; (2) Plaintiff does not adequately allege that Count III Defendants conspired with each other; (3) Plaintiff does not allege that Count III Defendants acted with discriminatory animus; (4) Plaintiff does not allege any overt acts in furtherance of an alleged conspiracy; and (5) Plaintiff does not allege that any purported conspiracy caused Plaintiff harm.

### 1. Under 42 U.S. § 1985(3), First and Fourteenth Amendment Rights Are Not Protected Against Private Interference.

As a threshold matter, even if NAGA could adequately allege any conspiracy between two or more defendants, the Complaint would nonetheless fail as a matter of law because neither Harris nor the Commanders are a state actor. While claims under § 1985(3), in some instances, can reach purely private conspiracies, the statute is purely remedial, rather than substantive, and its aim is to provide a remedy for private conspiracies that violate *otherwise existing* constitutional rights. *Great Am. Fed. Savs. & Loan Ass'n v. Novotny*, 442 U.S. 366, 368 (1979).

The Complaint alleges a conspiracy to violate Plaintiff's free speech (First Amendment) and equal protection (Fourteenth Amendment) rights—rights that are protected only from *government*, not private, intrusion. Notwithstanding Plaintiff's attempt to characterize its claims as deprivation of its "privileges and immunities" or "property" rights, the crux of Plaintiff's allegations are that Harris and the Commanders conspired to "silence" Plaintiff, Dkt. 1 ¶ 107, by (1) depriving Plaintiff of its right to "operate [its] nonprofit in accordance with [its] mission of educating the public," *id*. at ¶¶ 108, 109, (2) "giving deference to the powerful members of NCAI *and its message*," *id*. at ¶ 110 (emphasis added), and (3) depriving them the right to "defend their heritage," *id*. at ¶ 111. Each of these allegations concern Plaintiff's right to disseminate its message, and the Count III Defendants' alleged attempt to "silence" that message. Where a claim invokes "compelled silence" or forcing the end of a dialog, it is subject to First Amendment review.

*See Nat'l Fed'n of the Blind v. Pryor*, 258 F.3d 851, 854 (8th Cir. 2001) (citing *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 796-97 (1988). And the Eighth Circuit Court of Appeals has expressly held that First Amendment rights "are not rights that are protected against both private and official encroachment. The First Amendment erects a shield ***exclusively against governmental misconduct***. It provides no protection against private behavior, no matter how egregious." *Federer v. Gephardt*, 363 F.3d 754, 760-61 (8th Cir. 2004) (emphasis added); *see also Moore v. City of Desloge*, 647 F.3d 841, 845 (8th Cir. 2011) (affirming dismissal of certain defendants "because they are not state actors.").[14]

While the Complaint purports to additionally assert that Harris and the Commanders also deprived it of its "property" right to operate a nonprofit and defend its heritage, that allegation, wholly unsubstantiated by any assertion of fact, is nothing more than threadbare recitals and conclusory statements that fall far short of being plausible. *See Kraft*, 600 F. Supp. 3d at 970; *see also Faulk v. City of St. Louis, Missouri*, 30 F.4th 739, 747 (8th Cir. 2022) (citation omitted) ("Without some further factual enhancement a naked assertion of conspiracy stops short of the line between possibility and plausibility of 'entitlement to relief.'").

### 2. Plaintiff Does Not Plausibly Allege That the Count III Defendants Conspired with Each Other.

Even if any of the alleged constitutional violations were actionable (they are not), Plaintiff nonetheless fails to adequately allege any element of Count III. In order to satisfy the first element, Plaintiff must allege with particularity, and specifically demonstrate with material facts, that the defendants reached an agreement. *Davis v. Jefferson Hosp. Ass'n*, 685 F.3d 675, 685 (8th

---

[14] To the extent that Plaintiff characterizes its allegations as a deprivation of "equal protection of the laws," its claim fails for the same reason. *See W. Washington Cty Emergency Med. Servs. v. Washington Cty*, 967 F.2d 1252, 1255 (8th Cir. 1992) ("[T]here can be no equal protection violation without state action."); *Stevens v. Zeco, Inc.*, No. 1:15-cv-078, 2017 WL 4618272, at *5, (D.N.D. Apr. 14, 2017) (citing *U.S. v. Price*, 383 U.S. 787, 799 (1966)) ("The Fourteenth Amendment protects individuals against state action, not against wrongs done by individuals.").

Cir. 2012). This standard requires that "allegations of a conspiracy [be] pleaded with sufficient specificity and factual support to suggest a meeting of the minds directed toward an unconstitutional action." *Kelly*, 813 F.3d at 1078 (citing *Nelson v. City of McGehee*, 876 F.2d 56, 59 (8th Cir. 1989)) (quoting *Myers v. Morris*, 810 F.2d 1437, 1454 (8th Cir. 1987)). As discussed above, Plaintiff does not allege an agreement; it only alleges a single interaction between Harris and other executives and NCAI to issue a press release, Dkt. 1 p. 4, ¶¶ 71, 100, in which NCAI "applauds the Commanders" without *re-publishing* Laux's allegedly defamatory remark. Plaintiff's allegation that one Defendant contacted another Defendant, coupled with a legal conclusion of concerted action, falls far short of adequately alleging an agreement to do anything, let alone an agreement to violate a constitutional right. *See Kelly*, 813 F.3d at 1078; *see also Omaha Emps. Betterment Ass'n v. City of Omaha*, 883 F.2d 650, 653 (8th Cir. 1989) (holding that "[m]ere knowledge of another's wrongdoing is insufficient to hold a party liable as a conspirator."). Because Plaintiff has not alleged that any of the Count III Defendants reached a meeting of the minds, Count III fails.

### 3. Plaintiff Does Not Plausibly Allege That the Count III Defendants Acted with Discriminatory Animus.

To adequately allege the second element of Count III (i.e. that a defendant acted "for the purpose" of depriving another person or class of persons of a constitutional right), Plaintiff must show "a class-based invidiously discriminatory animus." *City of Omaha Emps. Betterment Ass'n*, 883 F.2d at 652. Where a Plaintiff fails to show "any racial animus on the part of defendants, . . . his § 1985(3) claim fails as a matter of law." *Davis v. Jefferson Hosp. Ass'n*, 685 F.3d 675, 685. While not clear, it appears as though Plaintiff's theory is that Harris and the Commanders conspired with NCAI—a Native American group—with animus towards *Native Americans*; but

37

Plaintiff of course does not—and cannot—plausibly or directly make such an allegation.[15] That alone is dispositive of Plaintiff's purported claim. *Id.*

### 4.   Plaintiff Does Not Plausibly Allege That the Count III Defendants Committed Any Act in Furtherance of the Object of the Alleged Conspiracy.

As to the third element, "[t]he law is clear that conclusory, vague, or general allegations of conspiracy are not enough to sustain a claim under § 1985." *Horst v. Abused Adult Res. Ctr.*, No. 1:19-CV-243, 2020 WL 1466199, at *3 (D.N.D. Mar. 26, 2020) (citing *Leon v. Murphy*, 988 F.2d 303, 311 (2d Cir. 1993)). As discussed above, the complaint merely states the unsupported *conclusion* that the two press releases—neither of which make *any* mention of NAGA, Laux, or Mr. Laux's allegedly defamatory statement—were somehow made in furtherance of an alleged conspiracy. Dkt. 1 ¶¶ 101-03. These sorts of conclusory and general allegations are precisely the type of claims that Courts routinely reject and dismiss for failure to state a cognizable claim. *See Horst*, 2020 WL 1466199 at *3; *Leon*, 988 F.2d at 311.

### 5.   The Complaint Fails to Plausibly Allege That Any Purported Conspiracy Caused Plaintiff Damages.

Plaintiff broadly states—without any support or justification—that it is entitled to $200,000 in damages because the Commanders and Harris (and NCAI) have allegedly "deprived" Plaintiff of its right to "operate [its] nonprofit in accordance with [its] mission of educating the public" and its right to "defend [its members] heritage." However, NAGA does not attempt to explain *how or why* it is now unable to operate in accordance with its mission or to defend the heritage of Native Americans. To the contrary, by Plaintiff's own admission, Plaintiff is *still* an active and currently

---

[15] At most, NAGA alleges that Harris and the Commanders "*favored one group* of Native Americans over *another* . . . group of Native Americans," Dkt. 1 ¶ 64,—a far cry from racial animus towards an entire *class* of individuals. *City of Omaha,* 883 F.2d at 652. Neither this assertion, nor any of Plaintiff's hyperbolic allegations concerning Harris's race or financial success, demonstrate any discriminatory animus on the part of Harris or the Commanders, whom Plaintiff concedes have been working to "combat[] systemic racism" against Native Americans. Dkt. 1 ¶ 69.

registered nonprofit organization, Dkt. 1 ¶ 1, and remains a "small, but mighty, grassroots organization," *id.* at ¶ 28, that is "fighting back," *id.* at ¶ 82, against "powerful" entities.

Courts in this Circuit have routinely held that, in order to adequately plead any claim, one must have suffered an injury in fact, and such an injury must be concrete, particularized, and either actual or imminent; vague and conclusory allegations of harm are insufficient. *See, e.g.*, *Arkansas Right to Life State PAC v. Butler*, 146 F.3d 558, 560 (8th Cir. 1998); *Rochling v. Dep't of Veterans Affairs*, 725 F.3d 927, 931 (8th Cir. 2013); *NHH Inv'r. Grp. v. DFH Watford, LLC*, No. 4:15-cv-027, 2015 WL 12867309, at *2 (D.N.D. Oct. 8, 2015); *Energy Transfer Equity, LP v. Greenpeace Int'l*, No. 1:17-cv-00173-BRW, 2018 WL 4677787, at *3 (D.N.D. July 24, 2018). Plaintiff's bald assertion that Harris and the Commanders have deprived it of its vaguely identified constitutional rights, by issuing a press release that makes no mention of Plaintiff, is precisely the type of conclusory statement of injury that does not "rise above a speculative level." *Rochling*, 725 F.3d at 931 (citation omitted). Therefore, Plaintiff's Count III purported claim must be dismissed for failure to state a claim upon which relief can be granted.

## <u>CONCLUSION</u>

Defendants, the Commanders and Harris, respectfully request that the Court dismiss the complaint against them for lack of personal jurisdiction, or, alternatively, for failure to state a claim on which relief can be granted, with prejudice, on all counts and award them their attorneys' fees and costs.

Dated:    December 28, 2023                    Respectfully submitted,

By their attorneys,


/s/ Henry A. Sullivan
Henry A. Sullivan, Esq.
Alain P. Mathieu, Esq.
Laura E. Martin, Esq.
Mintz, Levin, Cohn, Ferris,
Glovsky and Popeo, P.C.
One Financial Center
Boston, MA 02111
Tel. (617) 542-6000 // Fax (617) 542-2241
hasullivan@mintz.com; apmathieu@mintz.com;
lemartin@mintz.com

*Attorneys for Defendants Washington Commanders
and Josh Harris*


512616338v.1