UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA

_____

NATIVE AMERICAN GUARDIAN'S
ASSOCIATION                                                    No: 3:23-cv-00186

    Plaintiff

 -against-

WASHINGTON COMMANDERS, JOSH
HARRIS, MATTHEW LAUX, and THE
NATIONAL CONGRESS OF AMERICAN
INDIANS


    Defendants

_____


MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS MATTHEW LAUX, JOSH HARRIS, and the WASHINGTON COMMANDERS' MOTION TO DISMISS.


LAW OFFICE OF CHAD J. LAVEGLIA PLLC
626 RxR Plaza, Suite #613
Uniondale, New York 11556
(631) 450-2468
claveglia@cjllaw.org

*Attorneys for Plaintiffs*

## Table of Contents

**PRELIMINARY STATEMENT** .................................................................................................................. 3

**ARGUMENT** ............................................................................................................................................. 5

    I.    THIS COURT HAS SPECIFIC JURISDICTION OVER THE DEFENDANTS. ............................................... 5
        A.    Nature and Quality of Contacts ................................................................................ 6
        B.    Quantity of Contacts. ................................................................................................. 6
        C.    Relation of the Cause of Action to the Contacts. ..................................................... 7
        D.    North Dakota Has an Interest in Providing a Forum to Residents like NAGA. ........... 7
        E.    Convenience of the Parties Favors NAGA. ................................................................ 8
    II.    THIS COURT HAS PERSONAL JURISDICTION UNDER THE CALDER EFFECTS TEST ............................. 8
    III.    THE COMPLAINT PLAUSIBLY ALLEGES DEFAMATION ............................................................... 9
        A.    Fed. R. Civ. P. 12(b)(6) Legal Standard ........................................................................ 9
        B.    Elements of Defamation .......................................................................................... 10
        C.    The Complaint Plausibly Alleges Laux Published a False Statement of Fact Tending to Injure and Harm NAGA. ................................................................................................ 11
        D.    The Complaint Plausibly Alleges Defamation Per Se. .............................................. 13
        E.    The Complaint Plausibly Alleges Defamation By Implication. ................................. 13

**CONCLUSION** ....................................................................................................................................... 17

CASES

Arista Records, LLC v. Doe 3, 604 F.3d 110, [2d Cir. 2010] ------------------------------------------------ 10
Ashcroft v Iqbal, 556 U.S. 662, [2009]. ----------------------------------------------------------------------- 9, 10
Beaudoin v. S. Texas Blood & Tissue Ctr., 699 N.W.2d 421 [N.D. 2005] ----------------------------------- 7
Bell Atl. Corp. v. Twombly, 550 U.S. 544, [2007], ----------------------------------------------------------- 10
Burger King Corp. v. Rudzewicz, 471 U.S. 462, [1985] ------------------------------------------------------- 6, 7
Calder v. Jones, 465 U.S. 783 [1984] ----------------------------------------------------------------------------- 8
Dever v. Hentzen Coatings, Inc., 380 F.3d 1070 [8th Cir.2004] ---------------------------------------------- 7
Elias v. Rolling Stone LLC, 872 F.3d 97, [2d Cir. 2017] ------------------------------------------------------ 11
Epps v. Stewart Information Services Corp., 327 F.3d 642 [8th Cir.2003]. ------------------------------- 5
Forster v. W. Dakota Veterinary Clinic, Inc., 689 N.W.2d 366, [N.D. 2004] ----------------------------- 12
Gould v. P.T. Krakatau Steel, 957 F.2d 573 [8th Cir.1992]. -------------------------------------------------- 6
Hebron Brick Co. v. Robinson Brick & Tile Co., 234 [N.D.1975] -------------------------------------------- 5
Lynch v. City of New York et al., 952 F.3d 67,[2d Cir. 2018] ----------------------------------------------- 10
Matson v. Bd. of Educ. of City Sch. Dist. of New York, 631 F.3d 57, [2d Cir. 2011] ---------------------- 10
Neitzke v. Williams, 490 U.S. 319, [1989]. ------------------------------------------------------------------- 10
Nunes v. Lizza, 12 F.4th 890 [8th Cir. 2021]. -------------------------------------------------------------- 11, 16
Olson v. City of N. Liberty, 451 F. Supp. 3d 1010, 1027 [S.D. Iowa 2020] -------------------------------- 17
Pearce v. Werner Enterprises, Inc., 116 F. Supp. 3d 948 [D. Neb. 2015] --------------------------------- 17
RDO Foods Co. v. United Brands Intern., Inc., 194 F. Supp. 2d 962 [D.N.D. 2002]. ------------------- 5, 6
Schmitt v. MeritCare Health System, 834 N.W.2d 627 [N.D. 2013]. ------------------------------------- 11
Vinson v. Linn-Mar Community Sch. Dist., 360 N.W.2d 108 [Iowa 1984] ------------------------------- 13
West Publishing Co. v. Stanley, 2004 WL 73590, [D.Minn. Jan.7, 2004] ---------------------------------- 6

STATUTES

N.D. Cent. Code §14-02-02 -------------------------------------------------------------------------------------- 10

PRELIMINARY STATEMENT

It is no secret that Native Americans have endured some of the greatest tragedies in American history. Their history and culture precede this country's inception. Yet, Native Americans only occupy a small, often unseen portion of the population. Their history and culture are frequently left out of American history books used in classrooms across the country. Native American imagery in professional, collegiate, and high school sports however, kept Native American culture in the mainstream American conscience. Images of brave, stoic warriors donned the helmets and uniforms of athletes everywhere. Perhaps one of the most iconic images of all professional sports teams was the one used by the Washington Redskins. It depicted a portrait of a Native American named John Two Guns White Calf. Some of the best athletes in this country's history went into "battle" every Sunday with his portrait on their helmet. It was a sense of pride for many Native Americans. It was the reason members of the Native American Guardian's Association (NAGA) liked the Redskins. Their history could not be erased if teams like the Washington Redskins honored them. That all changed in 2020.

Racial tension disrupted the fabric of American society. Values that had endured for hundreds of years became socially unacceptable overnight. Frequently, people with different opinions were silenced by pejorative labels. This all occurred without debate, without discourse and without reason. One of the casualties of this war was John Two Guns White Calf and with him, the Redskins name. Pressured by powerful

lobbying groups like the National Congress of Native Americans (NCAI) former Redskins owner Dan Snyder changed the team's name. NAGA sat on the sidelines.

When billionaire owner Josh Harris bought the team in 2023, he knew what he was inheriting. Indeed, the new team ownership re-ignited the debate about changing the team's name back to the Redskins. NAGA—a small grassroots organization made up of Native Americans from different tribes—began a petition online to change the team's name back to the Redskins. NAGA explained that the name was not racist. To the contrary. The name symbolized the Bloodroot ceremony Native Americans took part in before battle. The Redskin name and imagery honored their culture. The petition gained momentum. Over 130,000 people signed the petition in support. But that is as far as it went. Harris never budged. But this case is not about the team's name.

NAGA fights hard to prevent the eradication of their culture. That is their main purpose. They simply want to preserve their place in American history. Their identity is intertwined with their Native American ancestry. While they failed in getting the team's name changed back, they caught the attention of many Redskins fans. This created a problem for the team now known as the Washington Commanders and its staff. Particularly, an employee named Matthew Laux. On August 29, 2023, Laux was trying to sell season tickets to a luxury box owner named Christine King. Ms. King told Laux that she would not purchase season tickets unless the team changed its name back to the Redskins. She also informed Laux that she had signed NAGA's petition. Laux told Ms. King that the people who started the petition were a fake

4

group. He then continued his sales pitch with an anecdote about how he allegedly grew up as a Redskins fan and liked the team because of where the team played as opposed to its name.

Defendants bring the instant motion challenging the complaint on jurisdictional grounds and in the alternative for failure to state a claim in which relief can be granted. Unsurprisingly, Defendants sum up Laux's statement as opinion, hyperbole, and NAGA's inflammatory, exaggerated, interpretation. Laux explicitly called the individual Native Americans who make up NAGA fake to convince Ms. King that NAGA was not a legitimate authority. According to Defendants though, there was nothing wrong with this. In an organization that promotes "inclusivity" it is acceptable to defame a minority group as long as the group shares a different viewpoint. Laux is still employed by the Commanders.

## ARGUMENT

I.   THIS COURT HAS SPECIFIC JURISDICTION OVER THE DEFENDANTS.

North Dakota's long arm statute permits personal jurisdiction to the fullest extent permitted by due process. Hebron Brick Co. v. Robinson Brick & Tile Co., 234 N.W.2d 250, 255–56 [N.D.1975]. This Court is constrained only by due process. RDO Foods Co. v. United Brands Intern., Inc., 194 F. Supp. 2d 962, 966–67 [D.N.D. 2002]. "To defeat a motion to dismiss for lack of personal jurisdiction, the nonmoving party need only make a prima facie showing of jurisdiction." Epps v. Stewart Information Services Corp., 327 F.3d 642, 647 [8th Cir.2003]. Plaintiff bears the burden of proof. Zidon v. Pickrell, 344 F. Supp. 2d 624, 627 [D.N.D. 2004].

5

"The Eighth Circuit has established a five-part test for measuring minimum contacts for purposes of asserting personal jurisdiction over a defendant: (1) the nature and quality of [a defendant's] contacts with a forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) [the] convenience of the parties." Id. "The first three factors are of primary importance, and the last two are of secondary importance." RDO Foods Co. at 967.

### A. Nature and Quality of Contacts

The dispositive issue for this factor is whether the non-resident defendants "have fair warning that a particular activity may subject a person to the jurisdiction of a foreign sovereignty." Gould v. P.T. Krakatau Steel, 957 F.2d 573, 576 [8th Cir.1992]. This prong is satisfied where the Defendant has "purposefully directed" his or her activities at the residents of North Dakota. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, [1985]. Here, Laux directed his statement against NAGA. Since NAGA is principally located in Devils Springs North Dakota, it has the same effect as directing his activities towards the residents of North Dakota.

### B. Quantity of Contacts.
This prong is not dispositive since jurisdiction is predicated on specific jurisdiction here. Zidon, at 632; *see also* West Publishing Co. v. Stanley, 2004 WL 73590, *4 [D.Minn. Jan.7, 2004].

6

**C. Relation of the Cause of Action to the Contacts.**

Defendants gratuitously admit that it has contacts with North Dakota in relation to ticket sales. Carabajal Decl. at ¶ ¶ 6, 7. The absence of facts in the complaint is not relevant in a motion to dismiss pursuant to Fed. R. Civ. P 12(b)(2). *See* Dever v. Hentzen Coatings, Inc., 380 F.3d 1070, 1072 [8th Cir.2004] (stating that "[t]he plaintiff's prima facie showing must be tested, not by the pleadings alone, but by the affidavits and exhibits presented with the motions and in opposition thereto."). Defendants mistakenly claim that these contacts are insufficient since even a single contact with North Dakota can confer personal jurisdiction. Beaudoin v. S. Texas Blood &amp; Tissue Ctr., 699 N.W.2d 421, 428 [N.D. 2005] (holding that a single contact could be sufficient, and that personal jurisdiction is not guided by mathematical comparisons since states with a smaller population like North Dakota would always be disadvantaged against states with greater populations and larger economic markets). *See also* Burger King Corp. v. Rudzewicz, at 475. Here, Defendant Commanders and Laux have contacts with the state of North Dakota through the solicitation and purchasing of ticket sales. Laux's defamatory statement was made in relation to soliciting a potential customer to buy season tickets. Thus, the cause od action claiming defamation is related to the contacts in North Dakota.

**D. North Dakota Has an Interest in Providing a Forum to Residents like NAGA.**

Native Americans account for 5.3% of North Dakotas population, making them the second largest population in North Dakota second only to white Americans.[1]

---

[1] https://www.census.gov/quickfacts/fact/table/ND/RHI325222 (last accessed January 19, 2024).

NAGA president Eunice Davidson is a Devils Spring Sioux Indian which is local to North Dakota. Furthermore, Eunice Davidson lives on a reservation. While this factor is traditionally not as dispositive as the preceding three, it should hold greater weight here since North Dakota has a significant interest in providing an accessible forum for justice to marginalized Native Americans living on reservations within North Dakota.

### E. Convenience of the Parties Favors NAGA.

It is evident that Defendants have significantly more resources than NAGA. Josh Harris owns three professional sports teams and is a billionaire. NAGA is a small grassroots organization with limited funds. Litigating this matter in another state would not only be inconvenient, but near impossible for them to afford.

## II. THIS COURT HAS PERSONAL JURISDICTION UNDER THE CALDER EFFECTS TEST.

In certain instances, the effects of the defamatory statement may provide an additional basis for this Court to assert personal jurisdiction *see* Calder v. Jones, 465 U.S. 783 [1984] (holding that California could assert personal jurisdiction over citizens of Florida because the defendants actions were aimed at California, they knew that the libelous statements in the article would have an impact on the California resident, and that the brunt of the harm would be suffered in California; the Court reasoned that under these circumstances, the defendants could reasonably anticipate being hailed into court in California). Analogously, Laux's statement was directed at residents who live exclusively on a reservation in North Dakota. The

libelous statement impacted NAGA in North Dakota and the brunt of the harm would be suffered in North Dakota. It is of no consequence whether Laux claims to have known that NAGA was headquartered in North Dakota. He was obviously aware of the petition, he knew that NAGA started the petition, and knew enough to claim that its members were fake. As such, Laux reasonably could have anticipated being haled into court in North Dakota. This Court should not save Laux simply because he might not have believed he would get caught. He risked the possibility that his statement would be leaked to NAGA when he transmitted it through text message to an independent third party. Furthermore, he made the statement on behalf of the Washington Commanders, in the context of a divisive national debate and Ms. King maintained a firm position on one side of the debate. Therefore, he—at a minimum—recklessly made the statement. Which means he was consciously aware of the possibility that it would reach NAGA but ignored it. Because recklessness is a higher standard of culpability than knowingly, Laux could reasonably anticipate being haled into court in North Dakota. Accordingly, this Court has personal jurisdiction over the Commanders and Laux under the Calder Effects Test.

III.  THE COMPLAINT PLAUSIBLY ALLEGES DEFAMATION.

### A. Fed. R. Civ. P. 12(b)(6) Legal Standard

It is beyond well settled that in deciding a Rule 12 (b) (6) motion to dismiss this Court is bound to accept all factual allegations in the complaint as true. Ashcroft v Iqbal, 556 U.S. 662, 678 [2009]. Furthermore, this Court's "task is to assess the legal feasibility of the complaint; it is not to assess the weight of evidence that might be

offered by either side: Because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible." Lynch v. City of New York et al., 952 F.3d 67, 75 [2d Cir. 2018]. "The choice between or among plausible inferences or scenarios is one for the fact finder. . .. [it] is not a choice to be made by the court on a Rule 12(b)(6) motion." Id.

To survive a motion to dismiss, the complaint "need not contain 'detailed factual allegations[.]'" Matson v. Bd. of Educ. of City Sch. Dist. of New York, 631 F.3d 57, 63 [2d Cir. 2011] (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 [2009]). While the plaintiffs must plead factual allegations that "raise a right to relief above the speculative level," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, [2007], the law demands "only enough facts to state a claim to relief that is plausible on its face." Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 [2d Cir. 2010]. A complaint is sufficient so long as a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," Iqbal, 556 U.S. at 678. "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely" Twombly, 550 U.S. at 556, (internal quotation marks omitted). Further, a court cannot dismiss a complaint "based on the judge's disbelief of a complaint's factual allegations." Neitzke v. Williams, 490 U.S. 319, 327 [1989].

### B. Elements of Defamation

Pursuant to N.D. Cent. Code §14-02-02 "[d]efamation is effected by (1) Libel or (2) Slander." Libel is defined under N.D. Cent. Code §14-02-03 as:

10

"a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes the person to be shunned or avoided, or which has a tendency to injure the person in the person's occupation."

However, statements that appear true can still be libelous if "they use innuendo, insinuation, or sarcasm to convey an untrue and defamatory meaning." Schmitt v. MeritCare Health System, 834 N.W.2d 627, 632 [N.D. 2013]. This Court must examine the context in which the statement was made and the document it was made in. Nunes v. Lizza, 12 F.4th 890, 897 [8th Cir. 2021]. Furthermore, "[i]t is well settled that the arrangement and phrasing of apparently nonlibelous statements cannot hide the existence of a defamatory meaning." Id. (internal quotations and citations omitted). Thus, "[w]hen a reader 'connecting the dots' could reasonably arrive at the [defamatory] implication, the author may be held accountable." Id. (quoting Elias v. Rolling Stone LLC, 872 F.3d 97, 109 [2d Cir. 2017]).

### C. The Complaint Plausibly Alleges Laux Published a False Statement of Fact Tending to Injure and Harm NAGA.

Defendant Matthew Laux works for the Washington Commanders as a Senior Manager in its Premium Hospitality department. Dkt. 30 ¶5. Laux is a salesman. In that capacity, Laux was speaking with a former luxury box owner named Christina King. Dkt. 1 ¶47. Laux was trying to persuade Ms. King to buy season tickets for a luxury box. Dkt. 1 ¶52. Ms. King informed Laux that she had signed NAGA's petition to restore the team's name to the Redskins. Dkt. 1 ¶50. Ms. King also informed Laux that her decision to purchase season tickets to a luxury box was contingent upon the

11

Commanders changing its name back to the Redskins. Laux responded via text message "you understand the **people** that started this petition is a **fake group** right." *Id.* at ¶51 (emphasis added). NAGA has plausibly plead that this statement was libelous, especially in the context it was made.

From the outset, the defamation claim is plausibly plead. First, NAGA is a registered 501(c)(3) organization headquartered in Devils Lake, North Dakota. Dkt 1 ¶1. Additionally, its members are all real Native Americans. Dkt 1 ¶¶ 29, 54. Thus, Laux's statement was false. *See* Forster v. W. Dakota Veterinary Clinic, Inc., 689 N.W.2d 366, 376 [N.D. 2004] (acknowledging that for a statement to be defamatory it must be false and published to a third party). Second, Laux published the libelous statement when he transmitted the text message to Ms. King. Dkt 1 ¶47. Third, Laux's statement exposed NAGA to ridicule and tended to injure NAGA in its pursuit of educating Americans about Native American culture since the statement directly attacked NAGA's legitimacy. Indeed, his statement is a classic *ad hominem* attack. Laux's statement—like all *ad hominem* attacks—attacked NAGA instead of NAGA's position. Thus, Laux's statement opened the door for members of the public to attack NAGA *see e.g.* Exhibit 1. Moreover, it significantly harmed NAGA's reputation because it tended to make them seem incredible or unworthy of belief. Laux's words explicitly defame NAGA since his statement—taken at face value—asserts that NAGA's members are fake. Since NAGA's membership consists exclusively of Native Americans, calling them fake means that they are not actually Native Americans.

Accordingly, the Court's inquiry should end here since Plaintiff's plausibly allege Laux's statement is libelous on its face.

### D. The Complaint Plausibly Alleges Defamation Per Se.

Alternatively, Laux's statement is defamation per se *accord* <u>Vinson v. Linn-Mar Community Sch. Dist.</u>, 360 N.W.2d 108, 116 [Iowa 1984] (finding statement accusing a person of falsifying information to be libelous per se). Here, Laux's accusation that NAGA is a "fake group" is synonymous with claiming that they falsified their credentials and the information they provide to the public. As such, it is plausibly defamation per se.

### E. The Complaint Plausibly Alleges Defamation By Implication.

The nature of Laux's statement, however, is also defamatory by implication. NAGA started the petition to change the team's name back to the Redskins because:

> "the name 'Redskins' carries deep cultural, historical, and emotional significance, honoring the bravery, resilience, and warrior spirit associated with Native American culture. It was never intended as a derogatory or offensive term but as a symbol of respect and admiration. Changing the name abruptly disregards the positive legacy that the Redskins name has built over the years and disorients the passionate fans who have invested their emotions, time, and unwavering support in the team. [NAGA] acknowledge[s] the concerns surrounding cultural sensitivity and the need to foster inclusivity. However, [NAGA] firmly believe[s] that there are alternative ways to honor and respect Native American heritage without erasing it…"

Dkt 1 ¶34. Further, Harris and the Commanders' decision to not change the name back to the Redskins forced NAGA and its members to helplessly watch as an iconic sports team that once honored their culture took steps backwards to eradicate it. The Redskins name referred to a Bloodroot Ceremony where Native Americans covered

themselves in the red dye from the roots of the Bloodroot plant before battle. Davis Decl ¶ 12. The image used by the Redskins was a portrait of an actual Native American named "John Two Guns White Calf." Davis Decl. ¶ 13. Indeed, NAGA and its members were fans of the Redskins because it honored their heritage. *Id.* at ¶10. Harris' decision to not change the team's name back to the Redskins demonstrated that he prioritized public perception over honoring Native American history and culture. Even worse, the team's new name "Commanders" added insult to injury because it paid homage to the same military forces that had slaughtered countless Native Americans.

In addition, George Floyd's murder in 2020 sparked a raging national "debate" about the treatment of people who were not white. The term debate is used loosely because it was not a debate at all. Instead, powerful corporations, the mainstream media, and government officials began to unilaterally decide what was and what was not racist. Folks with different opinions were "cancelled" by being labeled as racist or worse. *See e.g.* Dkt 1 ¶27. For instance, corporate sponsors like Nike and Pepsi threatened to withdraw financial support for the Washington Redskins if the organization did not change the team's name.

NAGA tried to be heard through the millions of screaming voices on social media. Davis Decl. ¶26. NAGA tried to educate non-Native Americans that the Redskin name was not racist and that removing the name actually perpetuated systemic racism against Native Americans. Davis Decl. ¶¶ 11, 16, 27. Even though NAGA's petition received approximately 132, 500 signatures, it did not move the needle. Dkt

1 ¶32. Harris and the Commanders ignored NAGA *id.* at ¶24. As such, this Court can infer that Harris contextually did not view NAGA as a bona fide organization. If he had, then surely, he would not have ignored them.

It was against this backdrop that Laux called NAGA, and the people in it, a fake group. In general, if Laux and Harris acknowledged NAGA's viewpoint, the Commanders justification for changing the team's name would dissipate. Furthermore, NAGA's view held weight because it is an organization comprised of Native Americans. That is, NAGA's explanation that the Redskins name is not racist to Native Americans is authoritative precisely because NAGA's members are Native Americans. Hence, stating that NAGA was comprised of people pretending to be Native Americans makes NAGA's viewpoint worthless since a group of people pretending to be Native Americans is not authoritative on whether the Redskin name is racist to Native Americans. Thus, the implication of Laux's statement in the broader context of the national debate is that NAGA's members were not real Native Americans.

More specifically, Laux defamed NAGA in a conversation in which he was trying to persuade Ms. King to buy season tickets. Ms. King not only signed NAGA's petition, but she relied on it as proof that the Redskins name was not racist. Thus, convincing Ms. King that NAGA was not comprised of real Native Americans would eliminate the authority she relied on to assert the name was not racist. It then follows, that Laux would be in a better position to sell her tickets by proving that her reason for

not wanting to purchase them was invalid or misplaced. Thus, the specific context supports the plausibility that Laux's statement was libelous by implication.

Laux inferentially intended to delegitimize NAGA so Ms. King would have no basis to believe that the Redskin name honored Native Americans. If Ms. King abandoned this belief, then Laux would remove the obstacle in his way of convincing her to purchase season tickets. Indeed, his use of the word "fake" can only mean that NAGA's members were not real Native Americans. Otherwise, it would have no persuasive value and would not make sense in the context of trying to convince Ms. King to purchase tickets. Therefore, Laux implied NAGA's members were not real Native Americans. Accordingly, the statement is plausibly libelous since a reader could "connect the dots" to reasonably arrive at the implication that NAGA's members were not real Native Americans. Nunes v. Lizza, 12 F.4th 890, 897 [8th Cir. 2021].

Examining the words Laux used also supports a libelous meaning. Laux stated "you understand the people that started this petition is a fake group right." The words "you understand" implies that Laux knew something Ms. King did not and that he was educating her. Moreover, Laux did not use any language conditioning the words that followed. He equivocally stated NAGA was a fake group. In addition, the words "the people" are significant in context because Laux targeted NAGA's members individually. He was not just referring to the group. Referring to NAGA's members as "people" instead of Native Americans supports the implication that his use of the term "fake", meant that NAGA's members were not bona fide Native Americans. Stating as facts that NAGA's national origin was bogus is certainly libelous.

Therefore, NAGA plausibly alleged that Laux's statement was defamatory on its face and by implication.

The Commanders are vicariously liable for Laux's statement. Laux made the statement in the scope of his employment. Dkt 1 ¶61. <u>Pearce v. Werner Enterprises, Inc.</u>, 116 F. Supp. 3d 948, 953 [D. Neb. 2015] (stating that "[u]nder the doctrine of respondeat superior, an employer may be held vicariously liable for the negligence or intentional torts of its employee, provided the employee was acting within the scope of the employer's business.").

Defendants' argument that the claim should be dismissed because it is open to multiple interpretations is unavailing because that is a question for a jury. *See* <u>Olson v. City of N. Liberty</u>, 451 F. Supp. 3d 1010, 1027 [S.D. Iowa 2020] (holding that "when the utterance can sustain two meanings, the jury decides which meaning the defendant conveyed").

Defendants' argument that NAGA is a public figure is meritless. Receiving over 130,000 signatures on a petition and some news coverage does not thrust NAGA into the realm of a public figure. Even though NAGA injected itself into the public debate. It did so along with millions of other people and bigger stakeholders. NAGA was not the center of attention to the extent it inadvertently thrust itself into public figure status.

## CONCLUSION

For the foregoing reasons this Court should deny all Defendants motion to dismiss in its entirety as well as its request for attorney's fees. In the alternative,

if this Court grants Defendants motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2) then this Court should not dismiss Plaintiff's defamation claim.

Dated:   January 18, 2024

                                                    Respectfully Submitted,

/s/ Chad J. Laveglia

CHAD J. LAVEGLIA ESQ.,
LAW OFFICE OF CHAD J LAVEGLIA PLLC
626 RxR Plaza, Suite #613
Uniondale, NY 11556
(631) 450-2468
claveglia@cjllaw.org